DIVISION 1181 AMALGAMATED TRANSIT UNION—NEW YORK EMPLOYEES PENSION FUND and Its Trustees, Plaintiffs,

v.

D & A BUS COMPANY, INC. and Anchor Bus Co., Inc., Defendants.

16–CV–5014 (DRH)(AKT)

United States District Court, E.D. New York.

Signed 09/12/2017

Owen Marc Rumelt, Slevin & Hart, P.C., West Hempstead, NY, Christopher Leins, Pro Hac Vice, Jeffrey S. Swyers, Slevin & Hart, P.C., Washington, DC, for Plaintiffs.

## MEMORANDUM & ORDER

HURLEY, Senior District Judge:

Presently before the Court is the August 25, 2017 Report and Recommendation ("R & R") of Magistrate Judge A. Kathleen Tomlinson recommending that plaintiffs' motion for default judgment be granted in part and denied in part. More particularly, Judge Tomlinson recommended that (1) default judgment be entered against defendant D & A and plaintiffs be awarded (a) $575,545.00 in withdrawal liability; (b) $38,732.30 in accrued interest; (c) $115,109.00 in liquidated damages; (d) $3,806.00 in attorneys' fees; (e) $846.03 in costs: and (f) the requested injunctive relief, to wit an injunction compelling D & A to provide plaintiffs with a complete list of each trade or business under its common control; and (2) the motion for default judgment against Anchor Bus. Co., In. be denied. More than fourteen days have elapsed since service of the R & R and no objections have been filed by defendants. Plaintiffs have filed objections limited to Judge Tomlinson's recommendation regarding Anchor Bus. Co., Inc. Unsure as to whether those claims would remain pending or dismissed under the R & R, Plaintiffs seek dismissal of the claims against Anchor Bus Co.,

Inc. without prejudice and have in fact filed a notice of voluntary dismissal of the claim against Anchor Bus Co., Inc. pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i).

As Plaintiff's notice of voluntary dismissal is proper, the Court will dismiss the claims against defendant Anchor Bus Co., Inc. without prejudice.

Pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72, this Court has reviewed the unobjected to portions of the R & R for clear error, and finding none, now concurs in both its reasoning and its result. The Court therefore adopts the August 25, 2017 R & R of Judge Tomlinson as to defendant D & A as if set forth herein.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for default judgment against defendant D & A Bus Company, Inc. is granted and plaintiffs are awarded: (1) $575,545.00 in withdrawal liability; (2) $38,732.30 in accrued interest; (3) $115,109.00 in liquidated damages; (4) $3,806.00 in attorneys' fees; (5) $846.03 in costs; and (6) an injunction compelling defendant D & A Bus Company, Inc. to provide plaintiffs with a complete list of each trade or business under its common control within twenty (20) days of service of a copy of the judgment upon it; and

**IT IS FURTHER ORDERED** plaintiffs' claims against defendant Anchor Bus. Co., Inc. are dismissed without prejudice.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

## REPORT AND RECOMMENDATION

A. KATHLEEN TOMLINSON, Magistrate Judge:

### I. PRELIMINARY STATEMENT

Plaintiff Division 1181 Amalgamated Transit Union—New York Employees Pension Fund (the "Fund") and its Trustees (the "Trustees") (collectively, the "Plaintiff") commenced this action against Defendants D & A Bus Company, Inc. ("D & A") and Anchor Bus Co., Inc. ("Anchor") (collectively, the "Defendants") pursuant to §§ 502(g)(2), 515 and 4219(c) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(g)(2), 1145 and 1399(c) as amended by the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1001, et seq. ("MPPAA"). Plaintiff seeks an award of withdrawal liability, interest, liquidated damages, attorney's fees, costs and injunctive relief due to Plaintiff under ERISA and the governing Collective Bargaining Agreement. See generally Complaint ("Compl.") [DE 1].

After Defendants failed to answer the Complaint, the Clerk of the Court noted their default in the docket on November 15, 2016, pursuant to FED. R. CIV. P. 55(a). See DE 14. Thereafter, Plaintiff filed the instant motion for entry of default judgment. See DE 15. Judge Hurley referred the matter to this Court for a Report and Recommendation as to whether the default judgment should be granted, and, if so, to determine the appropriate amount of damages, costs, and/or fees, if any, to be awarded. See December 27, 2016 Electronic Order. Based upon the information submitted by Plaintiff and for the reasons set forth below, the Court respectfully recommends to Judge Hurley that Plaintiff's motion be GRANTED, in part, and DENIED, in part in accordance with this Report and Recommendation.

### II. BACKGROUND

#### A. Statutory Background

##### 1. ERISA

The Employee Retirement Income Security Act ("ERISA") was created by

Congress in order to provide a comprehensive statutory framework for governing the administration of employee retirement plans. *Finkel v. Athena Light & Power LLC*, No. 14-CV-3585, 2016 WL 4742279, at *1 (E.D.N.Y. Sept. 11, 2016) (quoting *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 128 (2d Cir. 2012)). The statute has the primary purpose of

> Protect[ing] interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

19 U.S.C. § 1001(b). In addition, Congress sought to safeguard "the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." *Id.* § 1001(b). Thus, the statute was principally designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Finkel*, 2016 WL 4742279, at *1 (quoting *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211, 214, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). "To that end, the statute created an agency, the Pension Benefit Guaranty Corporation ("PBGC"), to administer an insurance system by collecting premiums from covered pension plans and paying out accrued benefits to employees in the event a pension plan has insufficient funds." *Finkel*, 2016 WL 4742279, at *1 (quoting *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129); *see* 29 U.S.C. § 1302 (creating the PBGC for the purposes of: "(1) encourage[ing] the continuation and maintenance of voluntary private pension plans for the benefit of their participants, (2) to provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries under plans to which this subchapter applies, and (3) to maintain premiums established by the corporation under section 1306 of this title at the lowest level consistent with carrying out its obligations under this subchapter.").

### 2. *Multiemployer Pension Plan Amendments Act ("MPPAA")*

One category of pension plans governed by ERISA is the multiemployer pension plan. *See Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129. Multiemployer pension plans require multiple employers to

> pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers. Plans of this sort offer important advantages to employers and employees alike. For example, employers in certain unionized industries likely would not create their own pension plans because the frequency of companies going into and out of business, and of employees transferring among employers, make single-employer plans unfeasible. Multiemployer plans allow companies to offer pension benefits to their employees notwithstanding these practicalities, and at the same time to share the financial costs and risks associated with the administration of pension plans.

*Id.* at 129 (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 605–07, 113 S.Ct. 2264, 124 L.Ed. 2d 539 (1993)); *see Finkel*, 2016 WL 4742279, at *1. The catalyst underlying the enactment of the MPPAA was the very real threat of widespread employer withdrawal, particularly acute in declining industries. *See Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129; *Finkel*, 2016 WL 4742279, at *2; *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n. 2, 104 S.Ct. 2709, 81 L.Ed. 2d 601 (1984). For each employer that withdraws from a multiemployer pension plan, the contribution burden shouldered by the remaining employers increase. *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129; *Finkel*, 2016 WL 4742279, at *2. Therefore, widespread employer withdrawal has the potential to significantly reduce the plan's contribution base which effectively "pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities." *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129 (quoting *R.A. Gray & Co.*, 467 U.S. at 722 n. 2, 104 S.Ct. 2709); *Finkel*, 2016 WL 4742279, at *2. These rising financial burdens may either encourage or force further withdrawals from the plan, "thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base." *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129 (quoting *R.A. Gray & Co.*, 467 U.S. at 722 n. 2, 104 S.Ct. 2709); *Finkel*, 2016 WL 4742279, at *2. The net effect would be akin to falling dominoes—thus signaling the death knell of the pension plan itself. *See Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129 (quoting *R.A. Gray & Co.*, 467 U.S. at 722 n. 2, 104 S.Ct. 2709); *Finkel*, 2016 WL 4742279, at *2. Further, such mass withdrawals would pose "an almost insurmountable burden on the PBGC." *Finkel*, 2016 WL 4742279, at *2 (quoting *R.A. Gray & Co.*, 467 U.S. at 722 n. 2, 104 S.Ct. 2709).

At the time ERISA was conceived, Congress failed to perceive the imminent dangers inherent in mass withdrawals by employers. In fact, certain provisions in the original legislation actually contributed to these problems by encouraging (1) withdrawal from weak multiemployer pension plans (without compensating these plans for inherited liabilities that would be passed on to the remaining employers); and (2) employers "who did not withdraw to terminate deteriorating pension plans" in the near term rather than attempting to keep them afloat. *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 129 (citing *Concrete Pipe & Prods. of Cal., Inc*, 508 U.S. 602, 607–08, 113 S.Ct. 2264, 124 L.Ed.2d 539); *see R.A. Gray & Co.*, 467 U.S. at 722, 104 S.Ct. 2709; *Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414, 416–17, 115 S.Ct. 981, 985, 130 L.Ed. 2d 932 (1995) (recognizing that ERISA's statutory "scheme encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat. Consequently, a plan's financial troubles could trigger a stampede for the exit doors, thereby ensuring the plan's demise.").

With the specter of the imminent collapse of the PBGC due to the insurmountable insurance burden placed upon it by mass employer withdrawals, *see Connolly*, 475 U.S. at 215, 106 S.Ct. 1018 (recognizing that "implementation of mandatory guarantees [funded by the PBGC] for mul-

tiemployer plans might induce several large plans to terminate, thus subjecting the insurance system to liability beyond its means"), Congress reacted by enacting the Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), Pub. L. No. 96–364, 94 Stat. 1208 (codified as amended in scattered sections of Titles 26 and 29 of the United States Code). *See Nat'l Shopmen Pension Fund v. DISA Indus., Inc.*, 653 F.3d 573, 575 (7th Cir. 2011) ("Congress enacted the MPPAA to address the risk of insolvency that arises when an employer withdraws from a pension plan. When that happens, the plan must ensure that it is adequately funded to provide benefits to workers as promised.") (citing *Central States, Se. and Sw. Areas Pension Fund v. O'Neill Bros. Transfer and Storage Co.*, 620 F.3d 766, 767–68 (7th Cir. 2010)); *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 130; *Finkel*, 2016 WL 4742279, at *2.

The passage of the MPPAA helped to significantly mitigate the problem of employer withdrawals by "changing [an employer's] strategic considerations. It transformed what was only a risk (that a withdrawing employer would have to pay a fair share of underfunding) into a certainty. That is to say, the MPPAA imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent). And it set forth a detailed set of rules for determining, and collecting, that charge." *Milwaukee Brewery Workers' Pension Plan*, 513 U.S. at 417, 115 S.Ct. 981. Thus, the primary goal of the MPPAA is to ensure that withdrawing employers are responsible for their fair share of inherited liabilities by mandating that "an employer [that] withdraws from a multiemployer plan . . . is liable to the plan in the amount determined . . . to be the withdrawal liability." ERISA § 4201(a), 29 U.S.C.

§ 1381(a); *see Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 130; *Finkel*, 2016 WL 4742279, at *2. This withdrawal liability represents the "withdrawing employer's proportionate share of the pension plan's unfunded vested benefits." *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 130; *Finkel*, 2016 WL 4742279, at *2. Pursuant to the MPPAA, withdrawing employers remit withdrawal liability payments in annual installments calculated "based upon each employer's historical contribution levels." *Trustees of Local 138 Pension Trust Fund*, 692 F.3d at 130; *Finkel*, 2016 WL 4742279, at *2; *see* ERISA §§ 4211(c), 4219(c), 29 U.S.C. §§ 1391(c), 1399(c).

### B. Factual Background

The following facts are taken from the Complaint and are assumed to be true for purposes of this motion.

The Fund "is a multiemployer pension plan within the meaning of Sections 3(37) and 4001(a)(3) of ERISA, 29 U.S.C. §§ 1002(37) and 1301(a)(3), which provides retirement benefits to eligible participants." Compl. ¶ 4. "The Trustees are fiduciaries of the Fund within the meaning of Section 3(21) of ERISA, 29 U.S.C. § 1002(21)." *Id.* ¶ 6. Defendants are New York corporations having a principal place of business located at 732 5th Avenue, Brooklyn, New York 11232. *Id.* ¶¶ 8–9.

During the relevant time period, Defendant D & A was a signatory to and bound by a Collective Bargaining Agreement ("CBA") with Amalgamated Transit Union Local 1181 (the "Union"), "a labor organization representing employees in an industry affecting interstate commerce." *Id.* ¶¶ 11–12; *see* CBA, attached as Exhibit ("Ex.") 2 to the July 19, 2017 Supplemental Declaration of Robert D'Ulisse ("D'Ulisse Supp. Decl.") [DE 19–1]. As part of its obligations as a signatory to the CBA, D &

A "was obligat[ed] to contribute to the Fund on behalf of its covered employees" and to "abide by the terms and conditions of the Agreement and Declaration of Trust establishing the Fund and any amendments thereto (the "Trust Agreement"), and the rules and policies adopted by the Trustees pursuant to the Trust Agreement." *Id.* ¶¶ 13–14; *see* D'Ulisse Supp. Decl., Ex. 1 (Trust Agreement), Ex. 5 (Policy for Collection of Delinquent Contributions), Ex. 6 (Withdrawal Liability Rules). In addition, D & A "was also obligated to submit monthly reports and contributions to the Fund. *Id.* ¶ 17.

The Trustees—pursuant to the authority vested in them as set forth in the Trust Agreement—adopted the "Policy for Collection of Delinquent Contributions (the "Collection Policy") and the Fund's Withdrawal Liability Rules." *Id.* ¶ 15; *see* D'Ulisse Supp. Decl., Exs. 5, 6. As is relevant here, "[t]he Fund's Withdrawal Liability Rules provide that interest on delinquent withdrawal liability payments shall be determined using the interest rates applicable to unpaid contributions to the Fund as provided in the Fund's Collection Policy." *Id.* ¶ 16; *see* D'Ulisse Supp. Decl., Ex. 6 (§ 8, ¶ 8.9). The Collection Policy, in turn, provides that the applicable interest rate shall be based upon the "Fund's custodial bank's prime rate plus 2% per annum." *Id.*; D'Ulisse Supp. Decl., Ex. 5 (§ 2, ¶ 2).

The Fund determined that as of June 30, 2014, D & A "effected a 'complete withdrawal' from the Fund, as said term is defined in Section 4203 of ERISA, 29 U.S.C. § 1383" and that as a result of this its withdrawal, D & A "incurred withdrawal liability to the Fund in the amount of $575,545.00, as determined under Section 4201(b) of ERISA, 29 U.S.C. § 1381(b)." *Id.* ¶¶ 18–19. In accordance with its statutory obligations as set forth in §§ 4202(2) and 4219(b)(1) of ERISA, 29 U.S.C.

§§ 1382(2) and 1399(b)(1), on September 9, 2015, Plaintiff sent D & A a Notice and Demand for payment of withdrawal liability via certified mail. *Id.* ¶ 20. The Notice and Demand contained the requisite payment schedule for remittance of a monthly withdrawal liability payment. *Id.* Specifically, the Notice and Demand informed D & A that its withdrawal liability totaled $575,545.00, which was payable "in 80 quarterly payments of $13,233.34." *Id.* ¶ 21. In addition, the Notice and Demand directed D & A to provide Plaintiff with a "complete list of each trade or business under 'common control' as said term is defined in ERISA Section 4001(b)." *Id.* ¶ 22. According to the Plaintiff, despite the explicit directives contained in the Notice and Demand—requiring remittance of payments and the provision of certain information—D & A nevertheless failed to comply. *Id.* ¶ 23. However, according to Plaintiff, the September 9, 2015 Notice and Demand was ultimately "returned to the Fund with 'return to sender, unable to forward' noted on the envelope." *Id.* ¶ 24.

In light of the fact that the September 9, 2015 Notice and Demand letter was returned as undeliverable, on January 8, 2016, Plaintiff again attempted to send, via certified mail, the Notice and Demand to the home address of the owner of Defendant D & A, Joseph Orapallo. *Id.* ¶ 25. However, Plaintiff never received a signed return receipt and was therefore unable to confirm that the Notice and Demand was delivered. *Id.* Thereafter, on March 2, 2016, Plaintiff made a third attempt to notify D & A of its withdrawal liability obligations by sending, via regular mail, an updated Notice and Demand containing a revised payment schedule which set forth an initial payment due date of May 1, 2016. *Id.* ¶ 26. Plaintiff did not receive any indication that "its March 2, 2016 Notice and Demand was not delivered." *Id.* ¶ 27.

On June 2, 2016, Plaintiff's counsel sent an additional letter notifying D & A that "it was delinquent in making its first quarterly withdrawal liability payment and that it would be in default within the meaning of ERISA Section 4219(c)(5)(A), 29 U.S.C. § 1399(c)(5)(A) if it did not cure the delinquency within 60 days from receipt of the letter." *Id.* ¶ 28; *see* D'Ulisse Supp. Decl., Ex. 6 (§ 1, ¶ 1.3 (defining default in substantially similar terms)). According to Plaintiff, it "has not received any indication that its June 2, 2016 letter was not delivered." *Id.* ¶ 29.

Significantly, Plaintiff asserts that "[n]either Defendant D & A nor any other trade or business under common control with [ ] D & A, including but not limited to [ ]Anchor, [ ] paid to the Fund any of the payments due under Defendant D & A's withdrawal liability payment schedule" or otherwise sought to initiate[ ] arbitration of the withdrawal liability assessment within the time period specified in Section 4221(a)(1) of ERISA, 29 U.S.C. § 1401(a)(1)." *Id.* ¶ 29.[1]

Based upon D & A's failure to remit interim withdrawal liability payments—notwithstanding its obligation to do so pursuant to the CBA and Sections 515 and 4219(c) of ERISA, 29 U.S.C. §§ 1145 and 1399(c)—"D & A is in default within the meaning of Section 4219(c)(5)(A) of ERISA, 29 U.S.C. § 1399(c)(5)(A) and 29 C.F.R. § 4219.33. As a result, the full amount of the withdrawal liability is now due and owing." *Id.* ¶¶ 33–35. As such, Plaintiff asserts it is entitled to $575,-545.00—the full principal amount of withdrawal liability—as well as "interest on the withdrawal liability at the rate of the Fund's custodial bank's prime rate plus 2%

per annum; an amount equal to the greater of the foregoing accrued interest or liquidated damages equal to twenty (20%) percent of the withdrawal liability; and the attorneys' fees and costs incurred by the Fund in collection of the delinquent withdrawal liability, including the attorneys' fees and costs of this action." *Id.* ¶ 36; *see* D'Ulisse Supp. Decl., Ex. 6 (§ 8, ¶ 8.7) which provides for acceleration of the entire amount of withdrawal liability in the event a default occurs as well as the payment of accrued interest in conjunction with additional interest or liquidated damages).

Moreover, Plaintiff states that in accordance with ERISA Section 4001(b)(1), 29 U.S.C. § 1301(b)(1), the obligation to remit withdrawal liability payments "extends . . . to all trades or businesses that are under common control with the employer within the meaning of Section 414(c) of the Internal Revenue Code, 26 U.S.C. § 414(c), and the regulation thereunder." *Id.* ¶ 38. As such, according to Plaintiff, "[a]t the time of [ ] D & A's withdrawal from the Fund, [ ] Anchor was a trade or business under common control with [ ] D & A within the meaning of Section 414(c) of the Internal Revenue Code, 26 U.S.C. § 414(c)" making it "jointly and severally liable for Defendant D & A's withdrawal liability under ERISA Section 4001(b)(1), 29 U.S.C. § 1301(b)(1)." *Id.* ¶¶ 39–40. In addition, in accordance with "Section 4219 of ERISA, 29 U.S.C. § 1399, notice of withdrawal liability assessment, default and all other notices provided under Sections 4201–4225 of ERISA, 29 U.S.C. §§ 1381–1405, sent to one member of a controlled group constitutes notice to all trades or businesses in the same controlled group." *Id.* ¶ 41. Based

---

1. Businesses that are either under "common control" or that are otherwise part of a "control group" are "treated as a single employer for purposes of ERISA withdrawal liability."

*Amalgamated Lithographers of America v. Unz & Co., Inc.,* 670 F.Supp.2d 214, 223 (S.D.N.Y. 2009); *see* 29 U.S.C. § 1301(b)(1).

upon the fact that Plaintiff provided the required notices, and neither D & A nor "any other trade or business under common control with [ ] D & A, including [ ] Anchor, has paid . . . any of the payments due under [ ] D & A's withdrawal liability payment schedule, they are now in default." *Id.* ¶¶ 42–43.

## III. LEGAL STANDARDS

### A. Standard of Review

For a movant to obtain a default judgment, it must complete a two-step process. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a). Once the clerk's certificate of default is issued, the moving party may then make an application for entry of a default judgment, pursuant to FED. R. CIV. P. 55(b). A default constitutes an admission of all well-pleaded factual allegations in the complaint and the allegations as they pertain to liability are deemed true. *See* FED. R. CIV. P. 8(b)(6); *Joe Hand Promotions, Inc. v. Duke Bazzel Tobacco & Lounge LLC,* No. 13 Civ. 300, 2014 WL 2711168, at *1 (N.D.N.Y. Jun. 16, 2014); *Gesualdi v. Specialty Flooring Systems, Inc.,* No. 11 Civ. 5937, 2014 WL 2208195, at *2 (E.D.N.Y. May 28, 2014); *Joe Hand Promotions, Inc. v. El Norteno Restaurant Corp.,* No. 06 Civ. 1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (citing *Greyhound Exhibitgroup, Inc. v. E.I. U.I. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993)); *Finkel v. Omega Commc'n Servs., Inc.,* 543 F.Supp.2d 156, 158 (E.D.N.Y. 2008) (citing *Garden City Boxing Club, Inc. v. Batista,* No. 05 Civ. 1044, 2007 WL 4276836, at *2 (E.D.N.Y. Nov. 30, 2007)).

However, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *Profi–Parkiet Sp. Zoo v. Seneca Hardwoods LLC,* No. 13 Civ. 4358, 2014 WL 2169769, at *3 (E.D.N.Y. May 23, 2014), *adopted by* 2014 WL 2765793 (E.D.N.Y. Jun. 18, 2014) (internal quotations omitted); *Bravado Int'l Grp. Merchandising Servs., Inc. v. Ninna, Inc.,* 655 F.Supp.2d 177, 186 (E.D.N.Y. 2009). The fact that a complaint remains unanswered will not suffice to establish liability on its claims since "a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading." *Said v. SBS Elecs., Inc.,* No. 08 Civ. 3067, 2010 WL 1265186, at *2 (E.D.N.Y. Feb. 24, 2010), *adopted as mod. by* 2010 WL 1287080 (E.D.N.Y. Mar. 31, 2010); *Gunawan v. Sake Sushi Rest.,* 897 F.Supp.2d 76, 83 (E.D.N.Y. 2012) ("[I]t remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action.").

In determining whether a default judgment should be entered, courts consider the same factors which apply to a motion to set aside entry of a default, namely: "1) whether the defendant's default was willful; 2) whether defendant has a meritorious defense to plaintiff's claims; and 3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Reliance Commc'ns LLC v. Retail Store Ventures, Inc.,* No. 12 Civ. 2067, 2013 WL 4039378, at *2 (E.D.N.Y. Aug. 7, 2013) (citing *Mason Tenders Dist. Council v. Duce Constr. Corp.,* No. 02 Civ. 9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003)); *see also O'Callaghan v. Sifre,* 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (finding that courts may consider "numerous factors, including whether plaintiff has been sub-

stantially prejudiced by the delay involved [ ] and whether the grounds for default are clearly established or in doubt" when deciding a motion for default judgment) (internal quotations and citation omitted); *U.S. v. DiPaolo*, 466 F.Supp.2d 476, 482 (S.D.N.Y. 2006) (finding that the grounds for a default judgment were established by the defendant's failure to answer the complaint, particularly in light of the fact that the defendant had expressed no intention to do so at a later time).

█ Ultimately, the decision to grant a motion for default judgment is left to the sound discretion of the court. *See Finkel v. Romanowicz*, 577 F.3d 79, 87 (2d Cir. 2009) ("In permitting, but not requiring, a district court to conduct a hearing before ruling on a default judgment, Rule 55(b) commits this decision to the sound discretion of the district court."); *Palmieri v. Town of Babylon*, 277 Fed.Appx. 72, 74 (2d Cir. 2008); *Shah v. New York State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir. 1999) ("The dispositions of motions for entries of defaults and default judgments ... are left to the sound discretion of a district court because it is in the best position to assess the individual circumstances of a given case and to evaluate the credibility and good faith of the parties.") (internal quotations omitted); *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993) ("The circumscribed scope of the district court's discretion in the context of a default is a reflection of our oft-stated preference for resolving disputes on the merits."); *Ainbinder v. Money Ctr. Fin. Grp., Inc.*, No. 10 Civ. 5270, 2014 WL 1220630, at *2 (E.D.N.Y. Mar. 24, 2014) ("The determination of a motion for default judgment is left to the sound discretion of the district court") (citing *Shah*, 168 F.3d 610, 615).

### B. The Law of Withdrawal Liability

█ "Withdrawal liability is part of a comprehensive legislative scheme designed to address the adverse consequences that arise when individual employers terminate their participation in, or withdraw from, multiemployer pension plans." *Gesualdi v. Seacoast Petroleum Prods., Inc.*, 97 F.Supp.3d 87, 97 (E.D.N.Y. 2015) (quoting *Burke v. Hamilton Equip. Installers, Inc.*, 02–CV–519, 2006 WL 3831380, at *4 (W.D.N.Y. Oct. 16, 2006)). In enacting the withdrawal liability provisions of ERISA, "Congress determined that unregulated withdrawals from multiemployer plans could endanger their financial vitality and deprive workers of the vested rights they were entitled to anticipate would be theirs upon retirement. For this reason, Congress imposed withdrawal liability as one part of an overall statutory scheme to safeguard the solvency of private pension plans." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 227–28, 106 S.Ct. 1018, 1027, 89 L.Ed. 2d 166 (1986); *Seacoast Petroleum Prods., Inc.*, 97 F.Supp.3d at 97. Thus, the fundamental purpose for imposition of withdrawal liability is " 'to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a [pension] plan which would result if liability were imposed only on a mass withdrawal by all employers.' " *Finkel*, 2016 WL 4742279, at *5 (quoting *HOP Energy, L.L.C. v. Local 553 Pension Fund*, 678 F.3d 158, 161 n. 2 (2d Cir. 2012)). Pursuant to 29 U.S.C. § 1381, in the event an employer completely or partially withdraws from a pension plan, the employer is liable to the plan for withdrawal liability "in order to protect any future benefits that may have vested for employees covered by the plan." *Rao v. Prest Metals*, 149 F.Supp.2d 1, 5 (E.D.N.Y. 2001); *Finkel*, 2016 WL 4742279, at *5; *see* 29 U.S.C. § 1381. A complete withdrawal occurs where an em-

ployer "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a); see Rao, 149 F.Supp.2d at 5; Finkel, 2016 WL 4742279, at *5; Seacoast Petroleum Prods., Inc., 97 F.Supp.3d at 97. A partial withdrawal occurs where "there is a 70-percent contribution decline" or "there is a partial cessation of the employer's contribution obligation" within a given plan year. 29 U.S.C. § 1385; Rao, 149 F.Supp.2d at 5.

■■■ Where an employer either completely or partially withdraws from a plan "the fund is vested with authority to determine the amount of withdrawal liability. It must then notify the withdrawing employer of its withdrawal liability, set a payment schedule, and formally demand payment." Seacoast Petroleum Prods., Inc., 97 F.Supp.3d at 97; Rao, 149 F.Supp.2d at 5; Finkel, 2016 WL 4742279, at *5 ("upon withdrawal from the pension plan, the plan's sponsor must determine the amount of the withdrawal liability and notify the withdrawing employer of that amount and provide an amortized payment schedule."); see 29 U.S.C. §§ 1382, 1399(b). The initial notification to the employer must occur "as soon as practicable after an employer's complete or partial withdrawal." 29 U.S.C. § 1399(b)(1); see Rao, 149 F.Supp.2d at 5. Within 90 days after the employer receives the notification from the plan sponsor, the employer can request that the plan sponsor: (1) "review any specific matter relating to the determination of the employer's liability and the schedule of payments;" (2) "identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer;" and (3) "furnish any additional relevant information to the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). After receiving the employer's request for review, the plan sponsor is required to notify the employer of the plan's decision, identify the basis for the decision and explain the reason for "any change in the determination of the employer's liability or schedule of liability payments." Id. § 1399(b)(2)(B).

■■■ Importantly, notwithstanding an employer's request for review of the plan's withdrawal liability determination, "[w]ithdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor ... beginning no later than 60 days after the date of the demand." 29 U.S.C. § 1399(c)(2); see Seacoast Petroleum Prods., Inc., 97 F.Supp.3d at 97; Finkel, 2016 WL 4742279, at *6; see also 29 U.S.C. § 1401(d) (mandating that withdrawal liability payments continue notwithstanding the pendency of an arbitration and must continue unabated until "the arbitrator issues a final decision...."). Indeed, "[t]o withhold the periodic payments required by the MPPAA pending a disposition of defendant's arguments on the merits would frustrate the clear congressional intent behind the requirement of interim payments." Bowers for & on Behalf of NYSA–ILA Pension Trust Fund v. Transportes Navieros Ecuadorianos (Transnave), 719 F.Supp. 166, 173 (S.D.N.Y. 1989). As such, "[b]y requiring payment pending appeal, the MPPAA effectuates the avowed purpose of shifting the economic burdens of withdrawal back to the withdrawing employer." Id. at 173–74; see Rao, 149 F.Supp.2d at 5 (recognizing that ERISA is a "pay-first-question-later statute in that the employer must make withdrawal liability payments regardless of whether there is a dispute as to the assessment of liability.") (internal citation omitted). In the event the employer fails to remit the required withdrawal liability payments pursuant to the schedule set forth by the plan sponsor, the plan sponsor again notifies the employer of the

delinquency and the employer, in turn, has 60 days from the date of receipt of the notification to cure the deficiency. 29 U.S.C. § 1399(c)(5)(B); *see Seacoast Petroleum Prods., Inc.*, 97 F.Supp.3d at 97–98; *Finkel*, 2016 WL 4742279, at *6.

Where an employer has availed itself of the review and appeal procedures set forth in 29 U.S.C. 1399(b) concerning the plan sponsor's withdrawal liability determination, any disputes that still remain must be submitted to and resolved through arbitration. 29 U.S.C. § 1401(a)(1); *see Finkel*, 2016 WL 4742279, at *6; *Trustees of Local 531 Pension Fund v. Flexwrap Corp.*, 818 F.Supp.2d 585, 589 (E.D.N.Y. 2011) (Any dispute over the plan's calculation of withdrawal liability must be settled through arbitration[.]"). Either party may initiate arbitration within 60 days after the earlier of: (1) "the date of notification to the employer under section 1399(b)(2)(B);" or (2) 120 days after the date of the employer's request under section 1399(b)(2)(A) of this title." *Id.*; *Finkel*, 2016 WL 4742279, at *6; *Rao*, 149 F.Supp.2d at 6. In addition, [t]he parties may jointly initiate arbitration within the 180–day period after the date of the plan sponsor's demand." *Id.* Where an employer "fails to request arbitration within the statutory time frame, it is barred from challenging the amount of withdrawal liability calculated by the plan." *Flexwrap Corp.*, 818 F.Supp.2d at 589 (citing 29 U.S.C. § 1401); *Labarbera v. United Crane & Rigging Servs.*, 08–CV–3274, 2011 WL 1303146, at *5, (E.D.N.Y. Mar. 2, 2011) ("an employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan, even in the

absence of documentation as to how the figure was calculated") (citations omitted).

Moreover, In the event an employer is found to be in default,[2] the plan sponsor is vested with a potent weapon in that it "may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." 29 U.S.C. § 1399(c)(5); *Flexwrap Corp.*, 818 F.Supp.2d at 589; *Nat'l Pension Plan of the Unite Here Works Pension Fund v. Swan Finishing Co.*, No. 05 Civ. 6819, 2006 WL 1292780, at *3 (S.D.N.Y.May 11, 2006); *Nat'l Pension Plan of the Unite Here Works Pension Fund v. Westchester Lace & Textiles, Inc.*, No. 05 Civ. 6138, 2006 WL 2051107, at *9 (S.D.N.Y. Jul. 21, 2006); *see also* 29 C.F.R. § 4219.33 (permitting plan to adopt additional rules "pertaining to acceleration of the outstanding balance on default").

## IV. DISCUSSION

### A. Basis for Liability

Generally, where a plan sponsor seeks withdrawal liability payments, it must "show only that it complied with statutory procedural requirements." *See Trustees of Amalgamated Ins. Fund v. Steve Petix Clothier, Inc.*, No. 03 Civ. 4530, 2004 WL 67480, at *2 (S.D.N.Y. Jan. 15, 2004); *Transportes Navieros Ecuadorianos (Transnave)*, 719 F.Supp. at 172. Thus, "[t]he plan sponsor must: (1) determine that an employer has partially or completely withdrawn from a multiemployer plan; (2) determine the amount of the employer's withdrawal liability; (3) notify

---

**2.** A "default" is defined under ERISA as "the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure, and any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." 29 U.S.C. § 1399(c)(5)(A), (B).

the employer of the amount of liability and the payment schedule; and (4) demand payment according to the schedule." *Steve Petix Clothier, Inc.*, 2004 WL 67480, at *2; *Ret. Plan of Nat. Ret. Fund v. Lackmann Culinary Servs., Inc.*, No. 7:10-CV-06316, 2011 WL 3366354, at *3 (S.D.N.Y. July 29, 2011) ("To succeed on a claim for withdrawal liability payments, a plan sponsor must (1) determine that an employer has partially or completely withdrawn from a multiemployer plan; (2) determine the amount of the employer's withdrawal liability; (3) notify the employer of the amount of liability and the payment schedule; and (4) demand payment according to the schedule.") (internal quotations and citation omitted). Having reviewed the Complaint, the Court is satisfied that Plaintiff has met the statutory prerequisites for imposition of withdrawal liability payments as against D & A. *See Bricklayers Ins. & Welfare Fund v. Verse Inc.*, No. 12–CV–4271, 2013 WL 4883966, at *4 (E.D.N.Y. Sept. 11, 2013) (finding liability sufficiently established based solely upon the well pleaded factual allegations in the Complaint).

■ Specifically, the Complaint alleges that D & A effected a complete withdrawal from the Fund as of June 30, 2014. *See* Compl. ¶¶ 18, 19; D'Ulisse Supp. Decl., Ex. 4 (Withdrawal Liability Actuarial Report). After determining D & A's total amount of withdrawal liability due and owning, Plaintiff sent D & A, via certified mail on September 9, 2015, the initial Notice and Demand for payment along with a payment schedule. Compl. ¶ 20. After the September 9, 2015 Notice and Demand was returned as undeliverable, Plaintiff sent another copy of the Notice and Demand to D & A's attention via certified mail on January 8, 2016. *Id.* ¶ 25; *see* D'Ulisse Decl, Ex. 4 (January 8, 2016 Notice and Demand Letter). Despite its best

efforts, Plaintiff could not confirm receipt by D & A and, as such, on March 2, 2016, it sent another copy of the Notice and Demand as well as a revised payment schedule to D & A via regular mail. *Id.* ¶ 26; *see* D'Ulisse Decl, Ex. 4 (March 2, 2016 Notice and Demand Letter). Plaintiff asserts it received no indication that the March 2, 2016 Notice of Demand "was not delivered." *Id.* ¶ 27. Based upon these facts, Plaintiff has satisfied the statutory prerequisites set forth in 29 U.S.C. § 1399(b) and, as such, has asserted a viable claim for the payment by D & A of delinquent withdrawal liability. *See Steve Petix Clothier, Inc.*, 2004 WL 67480, at *2; *Ret. Plan of Nat. Ret. Fund*, 2011 WL 3366354, at *3; *see also* 29 U.S.C. §§ 1382, 1399(b) (setting forth notification and demand requirements).

■ In addition to satisfying the elements for the award of interim withdrawal liability payments, Plaintiff has also pleaded facts illustrating that it is entitled to an accelerated payment of the entire withdrawal liability amount, pursuant to 29 U.S.C. § 1399(c)(5)(A) (providing that "the failure of an employer to make, when due, any payment under this section [shall constitute a default], if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure..."). Specifically, the Complaint alleges that on June 2, 2016, Plaintiff's counsel sent a letter advising D & A that because it had failed to remit its initial quarterly withdrawal liability installment payment by May 1, 2016—in accordance with the payment schedule contained in the March 2, 2016 Notice and Demand letter—that it risked being found in default within the meaning of 29 U.S.C. § 1399(c)(5)(A) if it failed to "cure the delinquency within 60 days from receipt of the letter." Compl. ¶ 28. Notwithstanding the June 2, 2016, letter, according to Plain-

tiff, D & A has not remitted "any of the payments due under [ ] D & A's withdrawal liability payment schedule." *Id.* ¶ 30. Likewise, Plaintiff states that D & A has failed to "initiate[ ] arbitration of the withdrawal liability assessment within the time period specified in [ ] 29 U.S.C. § 1401(a)(1)." *Id.* ¶ 31. As such, according to Plaintiff, "D & A is in default within the meaning of [ ] 29 U.S.C. § 1399(c)(5)(A) ... [and] [a]s a result, the full amount of the withdrawal liability is now due and owing." *Id.* ¶ 30

Here, in accordance with 29 U.S.C. § 1399(c)(5)(A), as well as the Fund's Withdrawal Liability Rules, Plaintiff sent a letter notifying D & A that if it failed to cure the payment delinquency within 60 days, it would be found in default. Notwithstanding this letter, Plaintiff asserts that D & A has nevertheless failed to remit the required withdrawal liability payments. Consequently, in accordance with ERISA, Plaintiff is entitled to an immediate payment of the entire unpaid amount of withdrawal liability due and owing. 29 U.S.C. § 1399(c)(5) ("In the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made."); D'Ulisse Supp. Decl., Ex. 6 (§ 8, ¶ 8.7); *see Seacoast Petroleum Prods.*, 97 F.Supp.3d at 97–98.

Plaintiff also seeks to establish joint liability against Anchor based upon the theory that "[a]s a trade or business under common control with [ ] D & A, Defendant Anchor is jointly and severally liable for Defendant D & A's withdrawal liability under ERISA Section 4001(b)(1), 29 U.S.C. § 1301(b)(1)" and because "notice of withdrawal liability assessment, default and all other notices provided under Sections 4201–4225 of ERISA, 29 U.S.C. §§ 1381–1405, sent to one member of a controlled group constitutes notice to all trades or businesses in the same controlled group." Compl. ¶¶ 40–41.

■ Plaintiff is correct that "[a]ll trades or businesses under common control are treated as a single employer for the purpose of collecting withdrawal liability, and each is jointly and severally liable for the withdrawal liability of another." *Trustees of the Local 813 Pension Tr. Fund v. Frank Miceli Jr. Contracting, Inc.*, No. 13CV0198, 2016 WL 1275041, at *3 (E.D.N.Y. Mar. 31, 2016) (quoting *UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 371 (2d Cir. 2015) (citing 29 U.S.C. § 1301(b)(1)); *see also* Internal Revenue Code § 414(c). However, Plaintiff has failed to plead any *facts* which support its allegation that Anchor is under common control with D & A (the obligated entity). Indeed, Plaintiff does no more than simply conclude that Anchor is a trade or business under common control with D & A, without setting forth facts from which it reached that conclusion. *See* Compl. ¶¶ 30–31, 39–40, 43. However, in order to impose withdrawal liability upon Anchor under a "common control" theory, Plaintiff must set forth facts illustrating that D & A and Anchor "are members of a 'parent-subsidiary' or 'brother-sister' group of trades or businesses under common control." *I.L.G.W.U. Nat'l. Ret. Fund v. ESI Grp., Inc.*, No. 92 CIV. 0597, 2002 WL 999303, at *5 (S.D.N.Y. May 15, 2002), *aff'd sub nom. I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*, 94 Fed.Appx. 850 (2d Cir. 2003) (citing 26 C.F.R. § 1.414(c)–2(a)); *see Frank Miceli Jr. Contracting, Inc.*, 2016 WL 1275041, at *3; *New York State Teamsters Conference Pension & Ret. Fund by Scalzo v. C & S Wholesale Grocers, Inc.*, No. 5:16-CV-84, 2017 WL

1628896, at *10 (N.D.N.Y. May 1, 2017). However, the Complaint lacks these necessary factual allegations.

Importantly, even in the context of a default judgment, it is "the plaintiff's burden to demonstrate that the uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action"); *Sciascia v. Prime Protective Servs., Inc.*, No. 13-CV-0800, 2014 WL 940721, at *5 (E.D.N.Y. Mar. 11, 2014) (same); *Flanagan v. Marco Martelli Assocs., Inc.*, No. 13-CV-6023, 2015 WL 1042279, at *4 (E.D.N.Y. Mar. 9, 2015) (same). Moreover, conclusory allegations, without more, are insufficient to establish liability. *See Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. CV 08-0068, 2010 WL 2133937, at *3 (E.D.N.Y. Mar. 11, 2010), *report and recommendation adopted*, No. 08-CV-0068, 2010 WL 2160058 (E.D.N.Y. May 27, 2010) ("The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims: a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading."); *Chanel, Inc. v. Louis*, No. 06-CV-5924, 2009 WL 4639674, at *3 (E.D.N.Y. Dec. 7, 2009) ("default does not establish conclusory allegations...."); *United States v. Marco Leather Goods Ltd.*, No. 12-CV-02386, 2013 WL 5350622, at *1 (E.D.N.Y. Sept. 23, 2013) (same); *Koszkos v. Janton Indus., Inc.*, No. 15-CV-1700, 2016 WL 4444329, at *2 (E.D.N.Y. Aug. 3, 2016), *report and recommendation adopted sub nom. Koszkos v. Janton Indus.*, 2016 WL 4444782 (E.D.N.Y. Aug. 23, 2016); *see also C & S Wholesale Grocers, Inc.*, 2017 WL 1628896, at *10 ("[B]ecause Plaintiff has not even remotely alleged facts that would plausibly suggest that Defendant and Penn Traffic constituted a single employer for purposes of ERISA withdrawal liability, the Court grants Defendant's motion to dismiss Plaintiff's third cause of action."). As such, Plaintiff has not met its burden here to show that Anchor is jointly and severally liable for the withdrawal liability incurred by D & A.

Based upon the foregoing analysis, the Court finds that the uncontroverted allegations set forth in the Complaint, without more, establish D & A's liability on each asserted cause of action but do not similarly establish Anchor's liability under a "common control" theory. Having determined that a basis for liability exists as against D & A, the Court turns its attention to the default judgment factors to determine whether entry of a default as to D & A is warranted here.

## B. The Default Judgment Factors

### 1. Willfulness

When a defendant is continually and "entirely unresponsive," a defendant's failure to respond is considered willful. *Trs. of the Pavers and Rd. Builders Dist. Council Welfare, Pension, Annuity and Apprenticeship, Skill Improvement and Safety Funds v. JREM Constr. Corp.*, No. 12 Civ. 3877, 2013 WL 618738 at *3 (E.D.N.Y. Jan. 28, 2013); *Bridge Oil Ltd. v. Emerald Reefer Lines*, LLC, No. 06 Civ. 14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008). Thus, as to the first factor, the failure of D & A to respond to the Amended Complaint, under the present facts sufficiently demonstrates willfulness. *See Elgard Corp. v. Brennan Const. Co.*, 248 Fed.Appx. 220, 222 (2d Cir. 2007); *Eastern Sav. Bank, FSB v. Beach*, No. 13 Civ. 341, 2014 WL 923151, at *5 (E.D.N.Y Feb. 12, 2014), *adopted by* 2014 WL 923151 (E.D.N.Y. Mar. 10, 2014); *Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007).

Here, Plaintiff submitted affidavits of service demonstrating that D & A was served with the Summons and Complaint on October 31, 2016. *See* DE 11. D & A neither answered nor otherwise responded in any way to the Complaint, nor did it request an extension of time to respond. In addition, Plaintiff provided the Court with Certificates of Service indicating that D & A was served with the Notice of Motion for Default Judgment and the accompanying Declarations and Exhibits. *See* DE 16. There is no indication that D & A's failure to respond to the Complaint as well as the instant motion, despite being properly served, was anything but deliberate.

### 2. *Meritorious Defense*

Where an employer fails to request arbitration within the timeframes set forth by ERISA, it is precluded "from asserting defenses to Plaintiff['s] claims of withdrawal liability." *Seacoast Petroleum Prod., Inc.*, 97 F.Supp.3d at 100; *see Trs. of the 1199 SEIU Health Care Employees Pension Fund v. Traymore Chemists, Inc.*, 13 CV 4070, 2014 WL 4207589, at *4, (E.D.N.Y. June 25, 2014) (Report and Recommendation), *adopted by* 2014 WL 4207592, (E.D.N.Y. Aug. 25, 2014) (recognizing that "if no arbitration is initiated, the employer 'waives its right to arbitration and its right to assert any defenses in [an] action seeking withdrawal liability.'") (quoting *Bakery & Confectionary Union & Industrial Pension Fund v. Mt. Rose Ravioli & Macaroni Co., Inc.*, 2011 WL 6130975, at *2 (E.D.N.Y. Nov. 10, 2011)); *Vacca v. Bridge Chrysler Jeep Dodge, Inc.*, 2008 WL 4426875 at *7 (E.D.N.Y. Sept. 4, 2008) ("It is well-settled that when a defendant fails to initiate arbitration under ERISA's provisions, the defendant's withdrawal liability becomes fixed and all defenses to that withdrawal liability are waived."). Moreover, as stated previously,

where an employer "fails to request arbitration within the statutory time frame, it is barred from challenging the amount of withdrawal liability calculated by the plan." *Flexwrap Corp.*, 818 F.Supp.2d at 589 (citing 29 U.S.C. § 1401); *Labarbera*, 2011 WL 1303146, at *5 ("an employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan, even in the absence of documentation as to how the figure was calculated") (citations omitted); *see Gesualdi v. Auburndale Mason Supply, Inc.*, No. 16 CV 2636, 2017 WL 3208597, at *3 (E.D.N.Y. June 30, 2017), *report and recommendation adopted*, 2017 WL 3208530 (E.D.N.Y. July 26, 2017).

In the instant case, by failing to timely request arbitration within the statutory timeframes provided by ERISA, *see* Compl. ¶ 31, D & A has waived its right to interpose defenses concerning the imposition of withdrawal liability as well as the overall amount calculated by the plan sponsor. *See Pavers & Rd. Builders Dist. Council Pension Fund by Montelle v. Nico Asphalt Paving, Inc.*, No. 15 CV 3994, 248 F.Supp.3d 374, 380, 2017 WL 1403339, at *4 (E.D.N.Y. Mar. 31, 2017) ("In failing to properly initiate arbitration or to initiate any action challenging the Fund's calculation of withdrawal liability within the statutorily prescribed time period, Nico has thus waived its right to raise a laches defense in this forum."); *Mt. Rose Ravioli & Macaroni Co, Inc.*, 2011 WL 6130975, at *3 ("Where a defendant does not initiate arbitration, it waives its right to arbitration and its right to assert any defenses in [an] action seeking withdrawal liability. Accordingly, the withdrawal liability assessed against the defendant becomes fixed.") (internal citation omitted). Therefore, to the extent D & A may have had meritorious defenses to Plaintiff's

claims, any such defenses have been implicitly waived based upon Plaintiff's failure to timely request arbitration. *See Gesualdi v. Reliance Trucking of CG Inc.*, No. 14-CV-4112, 2015 WL 1611313, at *10 (E.D.N.Y. Apr. 10, 2015) ("Defendant's failure to seek timely arbitration under ERISA precludes it from asserting defenses to Plaintiffs' claims of withdrawal liability here."); *Trustees of Leather Goods, Plastics, Handbags & Novelty Workers Union Local 1 Joint Ret. Fund v. Key Handling Sys. Inc.*, No. CV 14-2675, 2015 WL 5604184, at *4 (E.D.N.Y. June 5, 2015), *report and recommendation adopted*, 2015 WL 5604178 (E.D.N.Y. Sept. 23, 2015) (same).

### 3. Prejudice

▇ The last factor for the Court to consider is whether the non-defaulting party would be prejudiced if the motion for default judgment were to be denied. Denying this motion would be prejudicial to Plaintiff "as there are no additional steps available to secure relief in this Court." *See Trs. of the Pavers and Road Builders Dist. Council Welfare, Pension, Annuity and Apprenticeship, Skill Improvement and Safety Funds*, 2013 WL 618783, at *4 (internal quotation omitted); *Bridge Oil Ltd.*, 2008 WL 5560868, at *2 (citing *Mason Tenders*, 2003 WL 1960584, at *3). If a default judgment is not granted, the Plaintiff will have no alternative legal redress to recover the delinquent withdrawal liability. Since all three factors necessary to establish a default have been satisfied, the Court respectfully recommends to Judge Hurley that default judgment be entered against D & A.

### C. Damages

▇ Generally a party's default is viewed as a concession of all well-pleaded allegations of liability, it is not considered an admission of damages. *Greyhound*, 973 F.2d at 158. Therefore, once a party's default as to liability is established, a plaintiff must usually prove damages. *See Cement and Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. and Training Fund and Other Funds v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012); *Gutman v. Klein*, No. 03 Civ. 1570, 2010 WL 4975593, at *1 (E.D.N.Y. Aug. 19, 2010) ("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.") (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).

▇ However, where, as here, the damages sought consist, in part, of delinquent withdrawal liability payments and where the employer has otherwise failed to timely request arbitration, courts have the discretion to "adopt[ ] [ ] the sum proffered by the plan, even in the absence of documentation as to how the figure was calculated." *Labarbera*, No. 08-CV-3274, 2011 WL 1303146, at *5 (adopting Plaintiff's proffered amount of withdrawal liability "despite the lack of evidence regarding its calculation") (citing *Daniello v. Planned Sys. Integration Ltd.*, 2009 WL 2160536, at *5 (E.D.N.Y. July 17, 2009)); *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp.*, 938 F.Supp.2d 361, 367 (E.D.N.Y. 2013) (same); *Natale v. Country Ford Ltd.*, No. CV 10-4128, 2014 WL 4537501, at *6 (E.D.N.Y. Aug. 20, 2014) (same); *Gesualdi v. Ava Shypula Testing & Inspection, Inc.*, No. 13 CV 1873, 2014 WL 1399417, at *6 (E.D.N.Y. Apr. 10, 2014) (same); *Trustees of the Local 138 Pension Fund v. Tax Trucking Co.*, No. 09CV3041, 2015 WL 13446776, at *4 (E.D.N.Y. June 2, 2015), *report and recommendation adopted sub nom. Trustees of*

*Local 138 Pension Fund v. Tax Trucking Co.*, No. 09 CV 3041, 2017 WL 2779685 (E.D.N.Y. June 26, 2017); *see also Bd. of Trs. of the Private Sanitation Union Local 813 Pension Fund v. Metro Demolition Contracting Corp.*, No. 10-CV-00195, 2010 WL 5621275, at *3 (E.D.N.Y. Sept. 17, 2010) ("Although Plaintiffs did not submit any supporting documentation detailing how they arrived at $289,114.00, they were under no requirement to do so since Defendants' failure to initiate arbitration made the amount demanded by the Fund 'owing as a matter of law.' ").

In determining the categories of damages to which Plaintiff is entitled, the Court points out that " '[a]ny failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title).' " *Trustees of the Local 138 Pension Fund v. Tax Trucking Co.*, No. 09 CV 3041, 2015 WL 13446776, at *3 (E.D.N.Y. June 2, 2015), *report and recommendation adopted sub nom. Trustees of Local 138 Pension Fund v. Tax Trucking Co.*, 2017 WL 2779685 (E.D.N.Y. June 26, 2017) (quoting 29 U.S.C. § 1451(b)). Therefore, in accordance with 29 U.S.C. § 1132(g)(2)—which sets forth the applicable categories of damages available to a multiemployer pension fund when a participating employer fails to remit contributions (or in this case withdrawal liability payments)—a pension plan is required to be awarded the following damages:

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g)(2).

With these principles in mind, the Court will now address each requested category of damages.

### 1. Principal Amount of Delinquent Withdrawal Liability

Since D & A failed to timely request arbitration, its ability to contest the amount of withdrawal liability due and owing is foreclosed. *See Mt. Rose Ravioli & Macaroni Co, Inc.*, 2011 WL 6130975, at *3; *Flexwrap Corp.*, 818 F.Supp.2d at 590 ("[B]ecause [defendant] did not demand arbitration, [it] is barred from challenging Plaintiffs' calculation of the amount of unpaid withdrawal liability"); *see Nico Asphalt Paving, Inc.*, No. 15 CV 3994, 248 F.Supp.3d at 378, 2017 WL 1403339, at *3 ("Failure to timely initiate arbitration ... bar[s] the employer from challenging its liability in any forum."). As such, this Court has discretion, to "adopt[ ] [ ] the sum [of $575,545.00] proffered by the plan, even in the absence of documentation as to how the figure was calculated." *Labarbera*, No. 08-CV-3274, 2011 WL 1303146, at *5 (adopting Plaintiff's proffered amount of withdrawal liability "despite the lack of evidence regarding its calculation"); *see Daniello*, 2009 WL 2160536, at *5; *Dunhill Food Equip. Corp.*, 938 F.Supp.2d at 367; *Natale*, 2014 WL 4537501, at *6. Notwithstanding the Court's inherent discretion, in the instant case, Plaintiff has submitted a detailed actuarial report setting forth the manner and means by which the total withdrawal liability figure of $575,545.00 was calculated. *See* D'Ulisse

Supp. Decl., Ex. 3 (Actuarial Report). Having reviewed the Actuarial Report, the Court is satisfied that the principal amount of outstanding withdrawal liability has been sufficiently established. *See id.* (setting forth methodology used in determining withdrawal liability amount). Accordingly, this Court respectfully recommends to Judge Hurley that Plaintiff be awarded $575,545.00 in withdrawal liability. *See id.*

### 2. Interest on Delinquent Withdrawal Liability

Plaintiff seeks interest on the unpaid withdrawal liability amount totaling $38,732.30. *See* D'Ulisse Supp. Decl. ¶ 13. The Trust Agreement, Plan Rules and ERISA expressly provide for this category of damages. *See id.*, Ex. 1 (Trust Agreement, Art. VII § 9), Ex. 5 (Policy for Collection of Delinquent Contributions, § 2), Ex. 6 (Withdrawal Liability Rules, § 8); 29 U.S.C. § 1132(g)(2).

In order to adequately substantiate the total amount of interest requested, Plaintiff has submitted a Second Supplemental Declaration of Christopher M. Leins which sets forth the methodology used to arrive at the $38,732.30 figure. *See generally* August 10, 2017 Second Supplemental Declaration of Christopher M. Leins ("Second Supp. Leins Decl.") [DE 21]. Significantly, this declaration states that the interest was calculated "at the rate of the Fund's custodial bank's prime rate (3.5%) plus 2% per annum...." Leins Second Supp. Decl. ¶ 2; *see* D'Ulisse Supp. Decl., Ex. 5 (Policy for Collection of Delinquent Contributions, § 2) (setting forth that where the CBA fails to specify the rate of interest, such delinquent interest "shall accrue ... at the

rate of the Fund's custodial bank's prime rate plus 2% per annum."). After determining the applicable rate of interest, Plaintiff computed the Future Investment Value ("FV") based upon the delinquent amount of withdrawal liability ($575,545.00), utilizing the elapsed period of accrued interest—444 days or 1.21644 years (based upon the period of May 1, 2016 [the due date for the initial withdrawal liability payment] through July 19, 2017). *See* Leins Second Supp. Decl. ¶ 3. Utilizing a standard formula for determining the FV ("P(1 + I)^n")—where "P" is the Principal, "I" is the Interest Rate and "n" denotes the number of compounding periods—Plaintiff calculated the FV on the principal withdrawal liability amount ($575,545.00) as $614,277.30. *Id.*, Exhibit 1 (Exponential Calculator Printout Performing FV Calculation). Once the FV was calculated, the total interest accrued during the applicable period (May 1, 2016 through July 19, 2017) was calculated by subtracting the Principal ($575,545.00) from the FV amount ($614,277.30) which leaves the sum of $38,732.30. *Id.* ¶ 4. Moreover, Plaintiff calculated the daily amount of accrued interest ($87.23) by dividing the number of days in the Period of accrued interest (444) into the Total Interest ($38,732.30). *Id.* ¶ 5.

Having reviewed the methodology used, the Court is satisfied that Plaintiff has adequately established its entitlement to interest in the amount of $38,732.30 through July 19, 2017. As such, this Court respectfully recommends to Judge Hurley that Plaintiff be awarded interest in that amount.[3]

---

**3.** Although the Plan Rules provide that interest "shall accrue [ ] from the Due Date until the date payment is received," D'Ulisse Supp. Decl., Ex. 5 (Policy for Collection of Delinquent Contributions, § 2), Plaintiff has not provided the Court with the daily rate of

interest that will accrue from July 20, 2017 through the date of judgment. *See generally* Leins Second Supp. Decl. Specifically, the daily rate of interest set forth in the Second Supplemental Leins Declaration ($87.23) is based upon the 444-day period beginning on

### 3. Additional Damages

Plaintiff also requests additional damages pursuant to 29 U.S.C. § 1132(g)(2) in conjunction with the Fund's Withdrawal Liability Rules. *See* D'Ulisse Supp. Decl. ¶ 14, Ex. 6 (Withdrawal Liability Rules, § 8). Specifically, both ERISA and the Fund's Withdrawal Liability Rules provide that in the event of default, Plaintiff is entitled to "interest on the delinquent sum; or liquidated damages of 20 percent," whichever is greater. *See id.*, Ex. 6; 29 U.S.C. § 1132(g)(2). Here, Plaintiff requests liquidated damages in the amount of $115,109.00 or 20% of the outstanding withdrawal liability principal amount ($575,545.00). As set forth previously, Plaintiff calculated the total interest owed from May 1, 2016 through July 19, 2017 as $38,732.30. *See* Second Supp. Leins Decl. ¶¶ 3–6. As such, Plaintiff is entitled to additional damages amounting to $115,109.00 (or 20% of the principal amount)—the greater amount as between the total interest accrued during the applicable period and liquidated damages of 20% of the principal amount of withdrawal liability.

The Court is satisfied that Plaintiff has adequately substantiated its entitlement to additional damages amounting to 20% of the principal withdrawal liability. Therefore, this Court respectfully recommends to Judge Hurley that Plaintiff be awarded liquidated damages in the amount of $115,109.00 (20% of the outstanding withdrawal liability balance due).

### D. Injunctive Relief

In addition to its request for damages, Plaintiff seeks "[a]n injunction compelling Defendants' response to the Fund's request for a complete list of each trade or business under common control ... with Defendant D & A...." Compl. (Wherefore Clause). According to Plaintiff, the factual and statutory bases for this request stem from D & A's "failure to respond to the Fund's request for information by providing a complete list of each trade or business under 'common control'" as required by 29 U.S.C. § 1399(a). *Id.* ¶¶ 22, 47–49; *see* D'Ulisse Supp. Decl., Ex. 4 (January 8, 2016 Demand Letter [resent on March 2, 2016] requesting that D & A "furnish to the Fund within thirty (30) days a complete list of each trade or business under common control with [D & A]....").

29 U.S.C. § 1399(a) provides that "[a]n employer shall, within 30 days after a written request from the plan sponsor, furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with the requirements of this part." 29 U.S.C. § 1399(a); *see Nat'l Pension Plan of Unite Here Works Pension Fund v. Westchester Lace & Textiles, Inc.*, No. 05 CIV. 6138, 2006 WL 2051107, at *5 (S.D.N.Y. July 21, 2006). In addition, "[u]nder ERISA, '[w]ithdrawal liability extends to any trade or business under common control with the withdrawing employer.'" *Deianni v. New Media Printing*, No. CV 11-5267, 2012 WL 3842596, at *8 (E.D.N.Y. Aug. 17, 2012), *report and recommendation adopted*, No. 11 CV 5267, 2012 WL 3839618 (E.D.N.Y. Sept. 5, 2012) (quoting *UNITE Nat. Ret. Fund v. Veranda Mktg. Co.*, No. 04 CIV. 9869, 2009 WL 2025163, at *4 (S.D.N.Y. July 13, 2009)); *see* 29 U.S.C. § 1301(b) (stating that "all employ-

---

May 1, 2016 and ending on July 19, 2017. *See id.* ¶ 5. However, Plaintiff has not provided the Court with the daily rate of interest that would apply beginning on July 20, 2017 and continuing to the date of judgment. Without this information, the Court is unable to recommend that daily interest beginning on July 20, 2017 and continuing through the date of judgment be awarded here.

ees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer."). Further, 29 U.S.C. § 1132(a)(3)(A) permits a plan fiduciary to bring an action in order "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3)(A).

In light of the fact that Plaintiff requested that D & A provide it with "a complete list of each trade or business under 'common control,'" Compl. ¶ 22, and because D & A failed to respond to this request within the 30-day period required by 29 U.S.C. § 1399(a), this Court respectfully recommends to Judge Hurley that D & A be ordered to supply this information to Plaintiff forthwith. *See Deianni*, 2012 WL 3842596, at *8 ("Defendants have failed to provide the Plan with any [of the requested] information [relating to common control] in violation of ERISA. Accordingly, the undersigned recommends that defendants be directed to furnish the Plan [the] information ... requested in [its] September 6, 2011 letter.").

### E. Attorney's Fees

#### 1. *Applicable Law*

In adjudicating a motion for attorney's fees, both the Second Circuit and the Supreme Court have held that "the lodestar method—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro–North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2007)). The Court should determine the "presumptively reasonable fee" by looking to "what a reasonable paying client would

be willing to pay." *Arbor Hill*, 522 F.3d at 183–84.

"[W]hether the calculation is referred to as the lodestar or the presumptively reasonable fee, courts will take into account case-specific factors to help determine the reasonableness of the hourly rates and the number of hours expended." *Pinzon v. Paul Lent Mechanical Sys.*, No. 11 Civ. 3384, 2012 WL 4174725, at *5 (Aug. 21, 2012), *adopted by* 2012 WL 4174410 (E.D.N.Y. Sept. 19, 2012). These factors include:

> [T]he complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.

*Arbor Hill*, 522 F.3d at 184. "The party seeking reimbursement of attorneys' fees must demonstrate the reasonableness and necessity of hours spent and rates charged." *Finkel v. Omega Comm'n Svcs., Inc.*, 543 F.Supp.2d 156, 164 (E.D.N.Y. 2008) (citing *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136 (2d Cir. 1983)).

To determine reasonable hourly rates, the Court considers this Circuit's adherence to the forum rule, which states that a district court should generally use

the prevailing hourly rates in the district where it sits. *See Simmons v. N.Y. City Transit Auth.*, 575 F.3d 170, 175–76 (2d. Cir. 2009); *Polk v. N.Y. State Dep't of Corr. Servs.*, 722 F.2d 23, 25 (2d Cir. 1983); *see also Joseph v. HDMJ Restaurant, Inc.*, 970 F.Supp.2d 131, 156 (E.D.N.Y. 2013) (internal citations omitted); *Pinzon*, 2012 WL 4174725, at *5. Prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour. *See Am. Fire & Cas. Co. v. Scott Elec. Servs., LLC*, No. CV153111, 2017 WL 395207, at *2 (E.D.N.Y. Jan. 9, 2017), *report and recommendation adopted*, 2017 WL 374728 (E.D.N.Y. Jan. 25, 2017); *Incredible Foods Grp., LLC v. Unifoods, S.A. De C.V.*, No. 14-CV-5207, 2016 WL 4179943, at *3 (E.D.N.Y. Aug. 5, 2016); *Valdez v. H & S Rest. Operations, Inc.*, No. 14 CV 4701, 2016 WL 3079028, at *8 (E.D.N.Y. Mar. 29, 2016), *report and recommendation adopted*, 2016 WL 3087053 (E.D.N.Y. May 27, 2016); *OneWest Bank, N.A. v. Denham* No. CV 14-5529, 2015 WL 5562980, at *12 (E.D.N.Y. Aug. 31, 2015), *adopted by* 2015 WL 5562981 (E.D.N.Y. Sept. 21, 2015); *Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor–Mgmt. Cooperation Pension & Welfare Funds v. L & P Interiors, Inc.*, No. CV 14-3316, 2015 WL 5562316, at *13 (E.D.N.Y. Aug. 14, 2015) *adopted by* 2015 WL 5562340 (E.D.N.Y. Sept. 18, 2015); *Claudio v. Mattituck–Cutchogue Union Free Sch. Dist.*, No. 09 Civ. 5251, 2014 WL 1514235, at *14 (E.D.N.Y. Apr. 16, 2014) (collecting cases).

Some "[c]ourts have recognized slightly higher ranges in this district of $300–$450 per hour for partners, $200–$300 per hour for senior associates, and $100–$200 per hour for junior associates." *Small v. New York City Transit Auth.*, No. 09 Civ. 2139, 2014 WL 1236619, at *5 (E.D.N.Y. Mar. 25, 2014) (internal quotations omitted); *see Feltzin v. Ciampa Whitepoint LLC*, No.

15-CV-2279, 2017 WL 570761, at *2 (E.D.N.Y. Feb. 13, 2017); *Volpe v. Nassau Cty.*, No. 12 CV 2416, 2016 WL 6238525, at *6 (E.D.N.Y. Oct. 24, 2016); *Nicaisse v. Stephens & Michaels Associates, Inc.*, No. CV 14-1570, 2016 WL 4367222, at *4 (E.D.N.Y. June 9, 2016), *report and recommendation adopted*, No. 14-CV-1570, 2016 WL 4275687 (E.D.N.Y. Aug. 12, 2016); *Brinkmeier v. Round Two Recovery, LLC*, No. CV 153693, 2016 WL 4384330, at *9 (E.D.N.Y. July 25, 2016), *report and recommendation adopted*, No. 15-CV-3693, 2016 WL 4384723 (E.D.N.Y. Aug. 16, 2016).

The Second Circuit has not recently revisited the issue of what constitutes a reasonable fee within this district since its discussion in *Konits v. Karahalis*, 409 Fed. Appx. 418, 422–23 (2d Cir. 2011) (summary order). In *Konits*, the Court of Appeals affirmed a district court decision holding that the prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour. A number of district courts within this district continue to rely, in part, on *Konits* in determining the appropriate range of fees. *See Morales v. B & M Gen. Renovation Inc.*, No. 14 CV 7290M, 2016 WL 1266624, at *11 (E.D.N.Y. Mar. 9, 2016), *report and recommendation adopted*, 2016 WL 1258482 (E.D.N.Y. Mar. 29, 2016) (relying, in part, on *Konits* and finding that "the prevailing hourly rate for partners in this district is between $300 and $400); *Incredible Foods Grp., LLC*, 2016 WL 4179943, at *3 (same); *Valdez*, 2016 WL 3079028, at *8 (same); *Litkofsky v. P & L Acquisitions, LLC*, No. CV 15 5429, 2016 WL 7167955, at *9 (E.D.N.Y. Aug. 19, 2016), *report and recommendation adopted sub nom. Ira Litkofsky v. P & L Acquisitions LLS*, No. CV 15-5429, 2016 WL 7168069 (E.D.N.Y. Dec. 8, 2016) (same); *Gesualdi v. Paladin Constr.*

*Corp.*, No. CV 14-7291, 2016 WL 943589, at *11 (E.D.N.Y. Feb. 18, 2016), *report and recommendation adopted*, 2016 WL 953261 (E.D.N.Y. Mar. 11, 2016) (same); *Brinkmeier v. Round Two Recovery, LLC*, No. CV15 3693, 2016 WL 4384330, at *9 (E.D.N.Y. July 25, 2016), *report and recommendation adopted*, 2016 WL 4384723 (E.D.N.Y. Aug. 16, 2016); *Chauca v. Park Mgmt. Sys., LLC*, No. 10 CV 05304, 2016 WL 8117953, at *2 (E.D.N.Y. July 18, 2016) (relying, in part, on *Konits* and finding that hourly rate ranging from $250–$325 for attorney with approximately 11 years of experience in the area of employment discrimination, although "fall[ing] towards the higher end of the EDNY scale" was reasonable).

As to paralegals, courts in the Eastern District of New York have held that a range of $70 to $100 per hour constitutes a reasonable fee. *See United States ex rel. Joseph F. Tommasino, P.A., PhD v. Guida*, No. 10 CV 4644, 2017 WL 878587, at *3 (E.D.N.Y. Mar. 6, 2017); *D'Annunzio v. Ayken, Inc.*, No. 11-CV-3303, 2015 WL 5308094, at *4 (E.D.N.Y. Sept. 10, 2015); *Ferrara v. Prof'l Pavers Corp.*, No. 11 Civ. 1433, 2013 WL 1212816, at *5 (E.D.N.Y. Mar. 23, 2013); *Valdez*, 2016 WL 3079028, at *8; *see also Penberg v. HealthBridge Mgmt.*, No. 08 CV 1534, 2011 WL 1100103, at *7 (E.D.N.Y. Mar. 22, 2011) (finding $175 hourly rate for paralegals to be unreasonable and instead reducing the rate to $70 per hour); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 865 F.Supp.2d 284, 293 (E.D.N.Y. 2012), *aff'd*, 710 F.3d 57 (2d Cir. 2013), *and amended*, 956 F.Supp.2d 402 (E.D.N.Y. 2013) (finding a rate of $75 for paralegals to be reasonable); *See Finkel v. Rico Elec., Inc.*, 11 CV 4232, 2012 WL 6569779 (E.D.N.Y. Oct. 1, 2012), *adopted by* 2012 WL 6561270 (E.D.N.Y. Dec.17, 2012) (recognizing that

$90 per hour was a reasonable rate for a paralegal on an ERISA matter).

▬▬ To determine whether the number of hours spent by counsel was reasonable, the Court must "use [its] experience with the case, as well as [its] experience with the practice of law, to assess the reasonableness of the hours spent ... in a given case." *Fox Indus., Inc. v. Gurovich*, No. 03 Civ. 5166, 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)). A court should "exclude hours that were 'excessive, redundant, or otherwise unnecessary' to the litigation ...." *Cho v. Koam Medical Servs. P.C.*, 524 F.Supp.2d 202, 209 (E.D.N.Y. 2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)); *Barbu v. Life Ins. Co. of N. Am.*, No. 12-CV-1629, 2015 WL 778325, at *4 (E.D.N.Y. Feb. 24, 2015). Likewise, where counsel relies on vague / excessive entries or block billing practices which make it difficult for a court to assess reasonableness, an across-the-board fee reduction is warranted. *Anderson v. Cty. of Suffolk*, No. CV 09-1913, 2016 WL 1444594, at *6 (E.D.N.Y. Apr. 11, 2016) (recognizing that where "counsel relies on vague entries and block billing, courts are unable to review hours for reasonableness" and noting that "[c]ourts have imposed reductions as high as 40% based solely on vague billing entries"); *see Barbu*, 2015 WL 778325, at *5 (imposing a 33% reduction in total hours based upon vague entries and block billing); *Caban v. Employee Sec. Fund of the Elec. Products Indus. Pension Plan*, No. 10-CV-389, 2015 WL 7454601, at *8 (E.D.N.Y. Nov. 23, 2015) (33% reduction in overall hours spent due to block billing, vague entries, and excessive time spent on certain routine tasks); *Gagasoules v. MBF Leasing LLC*, 296 F.R.D. 107, 112 (E.D.N.Y. 2013) (40% reduction due to vague and unrelated en-

tries); *see also Ritchie v. Gano*, 756 F.Supp.2d 581, 583 (S.D.N.Y. 2010) (reducing attorneys' fee award by forty percent and holding that "[i]n the instance where a court has directed parties to parse out records to clearly state how much time the attorneys spent on each claim, and the parties have done so insufficiently and have referred to an unrealistic volume of hours as 'inextricably intertwined' with many claims, the court may also decrease the requested award amount"); *DeVito v. Hempstead China Shop, Inc.*, 831 F.Supp. 1037, 1045 (E.D.N.Y. 1993) (reducing attorneys' fee request by 40% due to duplication of work, vague descriptions of some of the work performed and the necessity of the work).

 Further, where counsel seeks compensation for time spent completing administrative tasks or work that should have been accomplished by a less-skilled practitioner, "[u]niform percentage cutbacks are warranted." *De La Paz v. Rubin & Rothman, LLC*, No. 11 Civ. 9625, 2013 WL 6184425, at *4 (S.D.N.Y. Nov. 25, 2013); *see Chavez v. MCS Claim Services, Inc.*, 2016 WL 1171586, at *5 (E.D.N.Y. March 23, 2016) (reducing total hours by 30 percent since "much of the work in this case could have been conducted by a less experienced associate billing at a significantly lower rate" and because "some of the work appears to be duplicative of work conducted in other similar FDCPA cases handled by the same counsel"); *Barshay v. Specified Credit Associates I, Inc.*, 2016 WL 3578993, at *4 (E.D.N.Y. June, 3,

2016) (reducing total hours claimed in FDCPA action by 20 percent in light of the duplicative nature of the work, the fact that many of the tasks could have been accomplished by "a less experienced associate" and based upon the overall lack of care taken in preparation of materials submitted to the court). The party seeking an award of attorneys' fees bears the burden to document "the hours reasonably spent by counsel, and thus must support its request by providing contemporaneous time records reflecting, for each attorney and legal assistant, the date, the hours expended, and the nature of the work done." *Cho*, 524 F.Supp.2d at 209 (internal citations, quotations, and alteration omitted).

### 2. *Application to the Facts*

#### i. Plaintiff's Entitlement to Attorney's Fees

In addition to damages, Plaintiff also seeks reimbursement of the attorney's fees incurred in prosecuting this action.[4] *See* Compl. (Wherefore Clause). Specifically, Plaintiff seeks $7,601.50 in fees corresponding to 32.7 hours spent prosecuting this action. *See* Billing Records (August 8, 2016 through December 7, 2016), attached as Ex. A to the December 22, 2016 Declaration of Christopher M. Leins (Liens Decl.") [DE 15–4].

Plaintiff asserts that "Attorney's fees are recoverable pursuant to ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2), the Fund's Policy for Collection of Delinquent Contributions and the Fund's Withdrawal Liability Rules. Having reviewed 29 U.S.C.

---

4. Despite interposing a motion for attorney's fees and costs in conjunction with its motion for entry of default, Plaintiff did not file a separate memorandum of law addressing these issues as required by Local Civil Rule 7.1. *See* Local Civil Rule 7.1(a) ( [A]ll motions shall include ... [A] memorandum of law....."); *Diaz v. Paragon Motors of Woodside, Inc.*, No. CV-03-6466, 2008 WL 2004001,

at *3 (E.D.N.Y. May 7, 2008). Nor did Plaintiff broach these topics in its Memorandum of Law in Support of Plaintiffs' Motion for Entry of Default Judgment. *See* DE 15–5. As such, to the extent Plaintiff may have sought to interpose argument as to the reasonableness of the hourly rates, overall hours expended and costs incurred, it has waived its opportunity to do so.

§ 1132(g)(2) and the applicable Plan Rules, the Court agrees. *See* 29 U.S.C. § 1132(g)(2) (stating, in part, that "reasonable attorney's fees and costs of the action, [are] to be paid by the defendant. . . ."); D'Ulisse Supp. Decl., Ex. 1 (Trust Agreement, Art. VII § 9), Ex. 5 (Policy for Collection of Delinquent Contributions, § 1), Ex. 6 (Withdrawal Liability Rules, § 8).

### ii. Reasonableness of Attorney's Fee Award

Having determined that Plaintiff is entitled to seek reasonable attorney's fees and costs, the Court turns its attention to the presumptively reasonable fee based upon Plaintiff's submissions. *See Laboy v. Office Equip. & Supply Corp.*, No. 15 CIV 3321, 2016 WL 5462976, at *16 (S.D.N.Y. Sept. 29, 2016), *report and recommendation adopted*, 2016 WL 6534250 (S.D.N.Y. Nov. 2, 2016) ("As the fee applicant, plaintiff 'bears the burden of documenting the hours reasonably spent by counsel, and the reasonableness of the hourly rates claimed.'") (quoting *General Elec. Co. v. Compagnie Euralair*, S.A., 96 Civ. 0884, 1997 WL 397627, at *4 (S.D.N.Y. July 3, 1997)).

Slevin & Hart, P.C. ("S & H"), Plaintiff's counsel of record in the instant case, requests fees in conjunction with work performed by attorneys Christopher M. Leins ("Leins"), Paul T. Esposito ("Esposito"), Owen M. Rumelt ("Rumelt") and "Firm Paralegals." *See* Leins Decl. ¶ 5. Specifically, Plaintiff seeks $7,601.50 in fees for 32.7 overall hours worked on this matter. *Id.* ¶ 9, Ex. A (Billing Records). As such, the Court must determine the overall reasonableness of the: (1) hourly rates requested for each attorney and paralegal who worked on the case; and (2) overall number of hours claimed.

### a. Reasonable Hourly Rate

S & H requests that each attorney who worked on this matter be compensated at hourly rates ranging from $300 per hour to $455 per hour. *See* Leins Decl. ¶ 5, Ex. A (Billing Records). Specifically, the hourly rates sought are as follows: (1) $300 per hour for Christopher M. Leins (Associate); (2) $365 per hour for Paul T. Esposito (Partner); $455 per hour for Owen M. Rumelt (Partner) and $195 per hour for "Firm Paralegals." *See id.*

In support of these hourly rates, S & H has included only cursory descriptions regarding each attorney's background and experience. *See* Leins Decl. ¶¶ 6–8. Moreover, no information has been provided with respect to the "Firm Paralegals" who worked on this case. *See id.* As an initial matter, the Court points out the perfunctory nature of the attorney descriptions. Significantly, they encompass no more than two or three brief sentences and provide the Court with almost no salient background information from which to ascertain the reasonableness of the hourly rates sought for each practitioner. In addition, no supporting exhibits setting forth in some detail the educational background and professional experience for each attorney have been attached for the Court's review. A curriculum vitae or resume could have provided the Court with the necessary detail to properly address whether the hourly rates sought are, in fact, reasonable in light of each attorney's background and experience. As it stands, the lack of detail does not assist in supporting the reasonableness of the hourly rates sought for each practitioner.

 It is Plaintiff's burden, as the party seeking fees, to "offer evidence to the Court in addition to the attorney's own affidavits why its requested fee is appropriate." *LV v. N.Y. City Dep't of Educ.*, 700 F.Supp.2d 510, 521 (S.D.N.Y. 2010);

*Laboy*, 2016 WL 5462976, at *16; *Prot. One Alarm Monitoring, Inc. v. Exec. Prot. One Sec. Serv., LLC.*, 553 F.Supp.2d 201, 208 (E.D.N.Y. 2008); *see Flores v. Mamma Lombardi's of Holbrook, Inc.*, 104 F.Supp.3d 290, 305 (E.D.N.Y. 2015) ("biographical information concerning the attorneys for whom charges were submitted [ ] is required to evaluate experience levels"). In light of the cursory nature of the information provided concerning each attorney's background and experience "[t]he Court ... will [primarily] rely on the decisional law and its own experience in assessing the reasonableness of [S & H's] requested rates." *LV*, 700 F.Supp.2d at 521 (citing *Farbotko v. Clinton County of New York*, 433 F.3d 204, 209 (2d Cir. 2005) (courts may take "judicial notice of the rates awarded in prior cases and [rely on their] own familiarity with the rates prevailing in the district") (alteration in original)); *see also Nat'l Ass'n for the Specialty Food Trade, Inc. v. Construct Data Verlag Ag*, No. 04 Civ. 2983, 2006 WL 4049155, at *17–18 (S.D.N.Y. Dec. 11, 2006) (declining to award fees at the requested rate and instead awarding at a lower rate for paralegals and law clerks because the court could not judge the reasonableness of the request where the moving party did not provide background and experience information); *Prot. One Alarm Monitoring, Inc.*, 553 F.Supp.2d at 209 (reducing requested hourly rates "because counsel has failed to provide information regarding the experience levels of the attorneys who worked on the case"); *Pilitz v. Inc. Vill. of Freeport*, No. CV 07-4078, 2011 WL 5825138, at *5 (E.D.N.Y. Nov. 17, 2011) ("Where, as here, the moving party fails to provide any biographical information to support the reasonableness of the rates, the court may use its discretion to award fees at a lower rate than requested.") (quoting *Artemide Inc. v. Spero Elec.*

*Corp.*, No. CV 09-1110, 2010 WL 5452075, at *4 (E.D.N.Y. Nov. 23, 2010)).

With respect to Attorney Rumelt (Partner), the information provided states that he "became a member of the Bar of the State of New York in 1985 and the Bar of the District of Columbia in 1986." Leins Decl. ¶ 8. In addition, he is a member in good standing of the "Second and Tenth Circuit Courts of Appeals [*sic*], as well as the Eastern, Northern, Southern and Western Districts of New York and the District of Columbia." *Id.* Turning to Attorney Esposito (Partner), the Leins Declaration states that Esposito "became an associate with the Firm in August 2006 and became a member of the Firm in January 2016." In addition, he is a member of the Bars of the State of the New York as well as the District of Columbia. *Id.* ¶ 7. Likewise, Attorney Leins became an associate with S & H in 2013 and is a "member of the Bar of the State of Virginia ... and the Bar of the District of Columbia[.]" *Id.* ¶ 6. With respect to the paralegal(s) who worked on this matter, Plaintiff has not provided the Court with any biographical information. The only information the Court was able to ascertain was gleaned from the billing records themselves and consisted of no more than the names of both paralegals (Clay M. Goode and Shane M. Savitsky), the hours expended (4.9 and 17.8 respectively) and the hourly rate sought ($195). *Id.*, Ex. A.

After reviewing this portion of the fee request, the Court is constrained to find that it lacks the essential details needed to determine the overall reasonableness of the fees sought by Attorneys Rumelt, Esposito and Leins as well as a presumptively reasonable fee for the paralegals tasked to this matter. Therefore, "[t]he Court ... will [primarily] rely on the decisional law and its own experience in assessing the reasonableness of [S & H's] requested

rates." *LV*, 700 F.Supp.2d at 521 (citing *Farbotko v. Clinton County of New York*, 433 F.3d 204, 209 (2d Cir. 2005) (courts may take "judicial notice of the rates awarded in prior cases and [rely on their] own familiarity with the rates prevailing in the district") (alteration in original)); *see also Nat'l Ass'n for the Specialty Food Trade, Inc. v. Construct Data Verlag Ag*, No. 04 Civ. 2983, 2006 WL 4049155, at *17–18 (S.D.N.Y. Dec. 11, 2006) (declining to award fees at the requested rate and instead awarding at a lower rate for paralegals and law clerks because the court could not judge the reasonableness of the request where the moving party did not provide background and experience information); *see also Prot. One Alarm Monitoring, Inc.*, 553 F.Supp.2d at 209 (reducing requested hourly rates "because counsel has failed to provide information regarding the experience levels of the attorneys who worked on the case"); *Pilitz*, 2011 WL 5825138, at *5 ("Where, as here, the moving party fails to provide any biographical information to support the reasonableness of the rates, the court may use its discretion to award fees at a lower rate than requested.") (quoting *Artemide Inc.*, 2010 WL 5452075, at *4).

■ Having considered (1) Plaintiff's submission in support of the hourly rates requested, (2) the overall complexity of this matter; and (3) this Circuit's adherence to the forum rule, the Court finds that a presumptively reasonable fee for Attorneys Rumelt and Esposito is $350.00 and $300.00 per hour respectively, while a presumptively reasonable fee for Attorney Leins is $200.00 per hour. In addition, in light of the fact that no information has been provided to justify the $195 per hour fee sought by each paralegal, the Court finds a presumptively reasonable fee of $90 per hour is appropriate.

While these rates are lower than those requested by counsel, the Court does not find that awarding hourly rates at or near the upper end of the spectrum is warranted here. As noted previously, prevailing rates for experienced attorneys in the Eastern District of New York range from approximately $300 to $400 per hour. *See Am. Fire & Cas. Co*, 2017 WL 395207, at *2; *Incredible Foods Grp., LLC*, 2016 WL 4179943, at *3; *Valdez*, 2016 WL 3079028, at *8; *see also Barbu*, 2015 WL 778325, at *3 ("Courts have awarded rates of $200 to $400 per hour for partners in this district."). In addition, $200 per hour is presumptively reasonable for an experienced associate working on a non-complex matter such as this. *See Small*, 2014 WL 1236619, at *5; *Nicaisse*, 2016 WL 4367222, at *4; *Brinkmeier*, 2016 WL 4384330, at *9; *In re Certain–Default–Motions Brought o/b/o Trustees of Empire State Carpenters Annuity, Apprenticeship, Labor–Mgmt. Coop., Pension & Welfare Funds*, Nos. 13–6364, 14–325, 14–2893, 2015 WL 968125, at *10 (E.D.N.Y. Feb. 27, 2015) *report and recommendation adopted*, 2015 WL 1247085 (E.D.N.Y. Mar.18, 2015) and 2015 WL 1396475 (E.D.N.Y. Mar. 25, 2015) ("[R]easonable fees in this district vary from $100 to $295 per hour for associates[.]") (citation omitted) (internal quotations omitted); *Flores*, 104 F.Supp.3d at 313 (same); *see also Chopen v. Olive Vine, Inc.*, No. CV 2012-2269, 2015 WL 1514390, at *15 (E.D.N.Y. Mar. 13, 2015), *report and recommendation adopted as modified*, 2015 WL 1542082 (E.D.N.Y. Mar. 31, 2015) (recognizing that "the nature of representation and type of work involved in a case are critical ingredients in determining the 'reasonable' hourly rate") (internal citation omitted). Likewise, with respect to work completed by paralegals, courts in the Eastern District of New York have held that a range of $70 to $100 per hour is a reasonable fee in matters such as this. *See*

*United States ex rel. Joseph F. Tommasino, P.A., PhD*, 2017 WL 878587, at *3; *D'Annunzio*, 2015 WL 5308094, at *4; *see also Penberg*, 2011 WL 1100103, at *7 (finding $175 hourly rate for paralegals to be unreasonable and instead reducing the rate to $70 per hour).

Where, as here, counsel has provided the Court with a "bare-bones" fee application, the Court is left with little choice but to engage in a downward adjustment of the hourly rates sought. Based upon the foregoing analysis, the Court respectfully recommends to Judge Hurley that Attorneys Rumelt and Esposito be compensated at an hourly rate of $350.00 and $300.00 per hour respectively, and that Attorney Leins be compensated at an hourly rate of $200.00 per hour. In addition, the Court further recommends that an hourly rate of $90.00 be awarded to each of the two paralegals who worked on this matter.

### b. Number of Hours Expended

Having determined the presumptively reasonable hourly rate for each attorney who has worked on this matter, the Court turns its attention to whether the overall number of hours being claimed is reasonable. Here, Plaintiff seeks compensation for a total of 32.7 hours of work associated with this action. Leins Decl., Ex. A. Plaintiff has broken this total down as follows: Paralegal Shane M. Savitsky, 17.8 hours; Attorney Leins, 8.0 hours; Paralegal Clay M. Goode, 4.9 hours; Attorney Esposito, 1.5 hours and Attorney Rumelt, .5 hours. *Id.*

■ Generally, when reviewing the overall reasonableness of a fee application, "a district court is not required to 'set forth item-by-item findings concerning what may be countless objections to individual billing items[.]'" *Reiter v. Metro. Transp. Auth. of State of N.Y.*, No. 01 CIV 2762G, 2007 WL 2775144, at *13 (S.D.N.Y. Sept. 25, 2007) (quoting *Lunday v. City of*

*Albany*, 42 F.3d 131, 134 (2d Cir. 1994)); *see Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (recognizing that "the court has discretion simply to deduct a reasonable percentage of the number of hours claimed "as a practical means of trimming fat from a fee application") (internal citation omitted); *Anello v. Anderson*, 191 F.Supp.3d 262, 283 (W.D.N.Y. 2016) ("[T]he district court is not obligated to undertake a line-by-line review of [an] extensive fee application ... In that regard, [a] court has discretion to impose an across-the-board reduction if an attorney has billed excessive, redundant, or unnecessary hours.") (internal citations omitted); *Gagasoules*, 296 F.R.D. at 111; *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 188 F.Supp.3d 333, 344 (S.D.N.Y. 2016) (" 'It is common practice in this Circuit to reduce a fee award by an across-the-board percentage where a precise hour-for-hour reduction would be unwieldy or potentially inaccurate.' ") (quoting *Ass'n of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG*, No. 04-CV-3600, 2005 WL 3099592, at *7 (S.D.N.Y. Nov. 17, 2005), *reconsideration denied*, 2009 WL 3816976 (S.D.N.Y. Nov. 10, 2009)).

■ Accordingly, the Court will not parse the contemporaneous billing records line-by-line here. Rather, if upon review of the contemporaneous time records the court "determines that the number of hours expended was excessive, redundant or otherwise unnecessary, the court [in its discretion] may ... account for such over-billing in an across-the-board percentage deduction." *Gagasoules*, 296 F.R.D. at 111 (quoting *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08 Civ. 1229, 2010 WL 1930237, at *8 (E.D.N.Y. May 11, 2010)); *KGK Jewelry LLC v. ESDNetwork*, No. 11-CV-9236, 2015 WL 2129703, at *2 (S.D.N.Y.

May 6, 2015); *Palmer v. Cty. of Nassau*, 977 F.Supp.2d 161, 170 (E.D.N.Y. 2013) (same); *Spence v. Ellis*, No. CV 07-5249, 2012 WL 7660124, at *6 (E.D.N.Y. Dec. 19, 2012), *report and recommendation adopted*, 2013 WL 867533 (E.D.N.Y. Mar. 7, 2013) (same); *see also Congregation Rabbinical Coll. of Tartikov, Inc.*, 188 F.Supp.3d at 344 ( [i]mpos[ing] a 30% reduction of the total number of hours for which compensation is sought"); *KGK Jewelry LLC*, 2015 WL 2129703, at *3 (40% across-the-board fee reduction imposed given the "straightforward nature of the sanctionable conduct"); *Saks Inc.v. Attachmate Corp.*, No. 14-CV-4902, 2015 WL 2358466, at *5 (imposing a 30% across-the-board fee reduction given the "excessive" hours expended in light of the "relative simplicity of the underlying dispute and the brief period during which this dispute was ongoing").

■■■ Having conducted a thorough review of the time records, the Court finds that the 32.7 hours billed out to be somewhat excessive because: (1) block billing pervades many of the time entries making it difficult for the Court to determine whether the length of time spent on discrete tasks was otherwise reasonable; (2) excessive and/or duplicative time was spent on certain tasks without sufficient explanation; and (3) the straightforward nature of this matter (uncontested) giving rise to this fee application. The Court will address each of these issues in turn.

■■■ The Court turns first to the liberal use of "block-billing" in many of the time entries. Although not *per se* unreasonable, *see Hines v. City of Albany*, 613 Fed.Appx. 52, 55 (2d Cir. 2015) (summary order); *see also United States v. Sixty–One Thousand Nine Hundred Dollars & No Cents ($61,900.00)*, 856 F.Supp.2d 484, 490 (E.D.N.Y. 2012) (declining to reject block billing on a *per se* basis), "[a]s a

general rule, [the practice] is disfavored." *Marshall v. Deutsche Post DHL*, No. 13-CV-1471, 2015 WL 5560541, at *12 (E.D.N.Y. Sept. 21, 2015) (quoting *Beastie Boys v. Monster Energy Co.*, 112 F.Supp.3d 31, 54 (S.D.N.Y. 2015)). Indeed, "[i]n the context of fee applications, 'block-billing makes it difficult if not impossible for a court to determine the reasonableness of the time spent on each of the individual services or tasks provided.' " *Marshall*, 2015 WL 5560541, at *12 (quoting *Sheet Metal Workers' Nat. Pension Fund v. Coverex Corporate Risk Solutions*, No. 09-CV-0121, 2015 WL 3444896, at *12 (E.D.N.Y. May 28, 2015) (citations omitted) (collecting cases)); *see Molefi v. Oppenheimer Trust*, No. 03 CV 5631, 2007 WL 538547, at *7–8 (E.D.N.Y. Feb.15, 2007) (recognizing that "block billing renders it difficult to determine whether, and/or the extent to which, the work done by … attorneys is duplicative or unnecessary"); *Reiter*, 2007 WL 2775144, at *15; *Bobrow Palumbo Sales, Inc. v. Broan–Nutone, LLC*, 549 F.Supp.2d 274, 283 (E.D.N.Y. 2008).

After reviewing the billing invoices, the Court finds that there are approximately 15 instances where block-billing was utilized. *See* Leins Decl., Ex. A. Although each individual use of block billing does not encompass a large span of time—when considered in the aggregate, the prevalence of these types of entries significantly "impedes [the] court's ability to assess whether the time expended on any given task was reasonable." *Blake v. N.Y. City Health & Hosps. Corp.*, No. 14 CIV 3340, 2016 WL 6520067, at *6 (S.D.N.Y. Nov. 3, 2016); *Synergy Aerospace Corp. v. LLFC Corp.*, No. 16 CV 2268, 2016 WL 5717582, at *4 (S.D.N.Y. Oct. 3, 2016) (same); *Sentry Ins. a Mut. Co. v. Brand Management Inc.*, No. 10-CV-347, 2013 WL 2644675, at *4 (E.D.N.Y. June 12, 2013) (recognizing

that counsel "has engaged in impermissible block billing" and finding that "[c]ourts routinely reduce the number of hours for this practice, as it impedes the Court's ability to properly assess whether an attorney spent a reasonable amount of time on a particular task"); *see also Aiello v. Town of Brookhaven*, No. 94 CV 2622, 2005 WL 1397202, at *3 (E.D.N.Y. June 13, 2005) ("[B]ecause block billing renders it difficult to determine whether, and/or the extent to which, the work done by ... attorneys is duplicative or unnecessary, courts apply percentage cuts where there is 'a substantial amount' of block billing in a fee request.") (internal citation omitted).

The Court has also observed that some time entries appear to be excessive or duplicative. *See Simmons v. New York City Dep't of Corr.*, No. 06 Civ. 5298, 2008 WL 4303474, at *6 (S.D.N.Y. Sept.16, 2008) ("the district court must account for duplicative or repetitive work to ensure that the ... fees represent only work that was necessary to the litigation and a cost efficient use of co-counsel and outside counsel") (internal quotation marks and citation omitted); *Empire State Carpenters Welfare v. Hanna Contracting, Inc.*, No. CV 10-0243, 2011 WL 845083, at *2 (E.D.N.Y. Feb. 8, 2011), *report and recommendation adopted sub nom. Empire State Carpenters Welfare, Pension, Annuity, Apprenticeship, Charitable Trust, Labor Mgmt. Cooperation & Scholarship Funds v. Hanna Contracting, Inc.,* , 2011 WL 846184 (E.D.N.Y. Mar. 7, 2011). For example, a review of the billing records illustrates that over five hours were spent preparing and filing two *pro hac vice* motions without any explanation as to why such a ministerial task required such an excessive amount of time. *See* Leins Decl., Ex. A. In addition, there is at least one instance where work was reviewed by both Attorney Esposito and Attorney Rumelt (both Partners) without any explanation for the duplicated effort. *See id.* (draft complaint reviewed by both attorneys).

Finally, a review of the billing records establishes that the work performed by S & H did not involve the analysis of novel or complex legal issues or otherwise implicate matters of first impression which might otherwise justify the hours expended. Rather, the work performed in this uncontested default action included routine, straightforward tasks related to common legal issues which in themselves do not justify the 32.7 hours of time expended by counsel. *See Empire State Carpenters Welfare*, 2011 WL 845083, at *2 (finding billing to be "excessive" given that the case involved "a relatively straightforward ERISA claim"); *KGK Jewelry LLC*, 2015 WL 2129703, at *3 ("Although KGK properly highlights that these delays resulted in correspondence and conferences with the Court and opposing counsel, wasted deposition preparation, and the briefing of a sanctions motion, these events alone cannot explain the inordinate number of hours contributed to standard letter motions, legal research, and supporting memoranda; nor can it explain why three attorneys' time was necessary."); *Osterweil v. Bartlett*, 92 F.Supp.3d 14, 33 (N.D.N.Y. 2015) (finding that 12.7 hours to prepare opposition brief was "excessive due to the simple nature of the opposition, which involved a straightforward legal argument..."); *see also Curves Int'l, Inc. v. Negron*, No. CV 11-2986, 2012 WL 4490542, at *7 (E.D.N.Y. Aug. 31, 2012), *report and recommendation adopted*, 2012 WL 4490553 (E.D.N.Y. Sept. 28, 2012) (recognizing that "hours spent litigating this matter [were] excessive .... [g]iven the straightforward nature of this case, [and the fact that] an attorney of lesser experience could have performed some or all of this work"); *Malletier v. Artex Creative Int'l Corp.*, 687 F.Supp.2d 347, 363 (S.D.N.Y. 2010) ("The [56.5] hours

expended on this relatively straightforward trademark action has convinced [the court] that a fifteen-percent reduction in the number of hours is warranted."); *K.L. v. Warwick Valley Cent. Sch. Dist.*, No. 12 CIV. 6313, 2013 WL 4766339, at *13 (S.D.N.Y. Sept. 5, 2013), *aff'd*, 584 Fed. Appx. 17 (2d Cir. 2014) (finding that "over $14,000 in fees, reflecting over thirty hours of attorney work" was "not at all reasonable" where "[n]either the fee application nor the reply involved complex or unusual legal issues. Moreover, a significant number of [the attorneys'] billing entries for the federal phase appear to involve time spent discussing and reviewing one another's work, which is excessive in light of the straightforward submissions ultimately filed."); *Suggs v. Crosslands Transp., Inc.*, No. 13-CV-6731, 2015 WL 1443221, at *12 (E.D.N.Y. Mar. 27, 2015) (concluding that "34.8 hours litigating this case" was "excessive in light of the work completed and the complexity of the issues addressed in the plaintiff's pleadings and motion papers" and reducing hours sought by 30%).

Taking all of the above deficiencies into consideration and mindful that the Court has the "discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from [Plaintiff's] fee application," *Congregation Rabbinical Coll. of Tartikov, Inc.*, 188 F.Supp.3d at 344, the Court finds that a 10% across-the-board reduction in the total hours claimed is warranted here. *See Ass'n of Holocaust Victims for Resti-*tution of Artwork & Masterpieces, 2005 WL 3099592, at *7 (applying 25% reduction to account for block billing, vagueness, and excess); *Concrete Flotation Sys., Inc. v. Tadco Const. Corp.*, No. 07-CV-319, 2010 WL 2539661, at *1 (E.D.N.Y. June 17, 2010) (adopting magistrate judge's recommendation that fees be reduced by 25% and reiterating that "it is common practice in the Second Circuit to reduce the fee award by an across-the-board percentage"); *Barbu*, 2015 WL 778325, at *5 (imposing a 33% reduction in total hours based upon vague entries and block billing); *Caban*, 2015 WL 7454601, at *8 (33% reduction in overall hours spent due to block billing, vague entries, and excessive time spent on certain routine tasks); *Gagasoules*, 296 F.R.D. at 112 (40% reduction due to vague and unrelated entries); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F.Supp. 510, 521 (S.D.N.Y. 1994) (employing a 30% across-the-board percentage reduction in compensable hours for vague billing entries, lack of contemporaneous time records, and duplicative billing); *see also Lochren v. Cty. of Suffolk*, 344 Fed. Appx. 706, 709 (2d Cir. 2009) (concluding that district court's "decision to reduce [requested attorney's] fees by 25% was not an abuse of discretion.").

The Court sets forth below a chart containing the name of each attorney/paralegal, the overall hours sought as well as the total rate charged based upon the requested hourly rates in the fee application.

| Attorney Name | Hourly Rate Requested | Total Hours Requested | Total Fee Requested |
|---|---|---|---|
| Owen M. Rumelt | $455.00 | 0.5 | $227.50 |
| Paul T. Esposito | $365.00 | 1.5 | $547.50 |
| Christopher M. Leins | $300.00 | 8.0 | $2,400.00 |
| Clay M. Goode | $195.00 | 4.9 | $955.50 |
| Shane M. Savitsky | $195.00 | 17.8 | $3,471.00 |
| **Requested Total** | | **32.7** | **$7,601.50** |

The following chart reflects the 10% across-the-board reduction as well as the adjusted hourly rates arrived at by the Court:

| Attorney Name | Adjusted Hourly Rate | Original Hours Sought | Hours After 10% Reduction | Adjusted Total Fee |
|---|---|---|---|---|
| Owen M. Rumelt | $350.00 | 0.5 | 0.4 | $140.00 |
| Paul T. Esposito | $300.00 | 1.5 | 1.3 | $390.00 |
| Christopher M. Leins | $200.00 | 8.0 | 7.2 | $1,440.00 |
| Clay M. Goode | $90.00 | 4.9 | 4.4 | $396.00 |
| Shane M. Savitsky | $90.00 | 17.8 | 16 | $1,440.00 |
| **Adjusted Total:** | | | 29.3 | $3,806.00 |

In light of the foregoing analysis, the Court respectfully recommends to Judge Hurley that Plaintiff be awarded a total of $3,806.00 in attorney's fees.

### F. Costs

#### 1. Applicable Law

Courts typically award "those reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients." *Reichman v. Bonsignore, Brignati & Mazzotta, P.C.*, 818 F.2d 278, 283 (2d Cir. 1987); *Sheet Metal Workers Nat'l Pension Fund v. Evans*, No. 12 Civ. 3049, 2014 WL 2600095, at *11 (E.D.N.Y. Jun. 11, 2014). However, it is incumbent upon the party seeking reimbursement of its costs to provide the court adequate substantiation in the form of receipts and other documents not only showing such costs were incurred, but that they were paid. *See Lee v. Santiago*, No. 12 CIV. 2558, 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("[I]t is [ ] the requesting party's burden to support its application, and this means that the requested costs must be substantiated ... A mere assertion that a certain cost was incurred, though, is insufficient, where such an assertion is made in a conclusory fashion in a brief or bill of costs, without a supporting affidavit, declaration, or documentation."); *Volpe v. Nassau Cty.*, No. 12 CV 2416, 2016 WL 6238525, at *10 (E.D.N.Y. Oct. 24, 2016) ("The fee applicant bears the burden of adequately documenting and itemizing the costs requested.") (internal quotation omitted). In addition, Local Civil Rule 54.1 states that "the party must include as part of the request 'an affidavit that the costs claimed are allowable by law, are correctly stated and were necessarily incurred,'" and "[b]ills for the costs claimed must be attached as exhibits." *Id.* (quoting *D.J. ex rel. Roberts v. City of New York*, No. 11-CV-5458, 2012 WL 5431034, at *9 (S.D.N.Y. Oct. 16, 2012), *report & recommendation adopted sub nom. Roberts v. City of New York*, 2012 WL 5429521 (S.D.N.Y. Nov. 7, 2012)).

Generally, the only exception to this rule is where reimbursement is sought for a filing fee. In such cases, a court may take judicial notice of the fact that the fee was paid by virtue of entries in the docket. *See Douyon v. NY Med. Health Care, P.C.*, 49 F.Supp.3d 328, 352 (E.D.N.Y. 2014), *judgment entered sub nom. Douyon v. N.Y. Med. Health Care, P.C.*, No. CV 10-3983, 2015 WL 5821499 (E.D.N.Y. Sept. 30, 2015) ("The Court takes judicial notice of the $350 filing fee reflected on the docket."); *Lee v. Santiago*, No. 12 CIV. 2558, 2013 WL 4830951, at *5 (S.D.N.Y. Sept. 10, 2013) ("Court fees that are reflected on the Court's docket are sufficiently substantiated").

#### 2. Application to the Facts

In addition to a fee award, Plaintiff requests an award of the costs expended in

pursuing this action. These expenses are as follows: (1) Filing Fees ($700); (2) Service Fees ($325.00) (N.Y. Secretary of State); (3) Treasurer of Virginia ($10) (Certificate of Good Standing); (4) Treasurer of D.C. ($5) (Certificate of Good Standing); (5) Postage, Photocopying, Long Distance Telephone ($83.07); (6) Lexis Nexis Asset Search ($13.80); and (7) Miscellaneous Expenses ($12.96). *See* Receipts for Costs, attached as Ex. 1 to the July 19, 2017 Supplemental Declaration of Christopher M. Leins ("Leins Supp. Decl.") [DE 19–2]. The Court addresses each category in turn.

With respect to the $400.00 filing fee, Plaintiff has provided a receipt, and, the Court would, in any event, take judicial notice that the filing fee was paid. As such, the Court finds that Plaintiff is entitled to reimbursement of this expenditure. *See* Leins Supp. Decl., Ex. A.

▮ Plaintiff also seeks reimbursement in the amount of $300.00 for each of the two *pro hac vice* applications that S & H filed on its behalf ($150.00 each). Leins Supp. Decl., Ex. 1. Some courts have taken the position that "*pro hac vice* admission fees are not taxable as costs" and on that basis have declined to award reimbursement of the filing fees associated with filing the motion. *Document Sec. Sys., Inc. v. Coupons.com, Inc.*, No. 11-CV-6528, 2015 WL 1189551, at *2 (W.D.N.Y. Mar. 16, 2015); *LaBombard v. Winterbottom*, No. 814 CV 00071, 2015 WL 9450838, at *2 (N.D.N.Y. Dec. 23, 2015) ("[T]he Court declines to extend the costs recoverable pursuant to Rule 54(d)(1) to include *pro hac vice* filing fees."). However, other courts take a different view. *See Osterweil*, 92 F.Supp.3d at 37 ("[T]he district courts in this Circuit often award attorney's fees and costs associated with *pro hac vice* admission.") (citing *Deferio v. Bd. of Tr. of State Univ. of New York*, No. 5:11-CV-

0563, 2014 WL 295842, at *14 (N.D.N.Y. Jan. 27, 2014) (collecting cases awarding fees and expenses related to *pro hac vice* admission in cases in which the prevailing parties also had local co-counsel)). This Court agrees with the view taken by the Courts in *Document Security Systems, Inc.* and *LaBombard*—that costs associated with the filing of *pro hac vice* applications are generally not reimbursable. As such, the Court declines to recommend that these costs be awarded here. *See Document Sec. Sys., Inc.*, 2015 WL 1189551, at *2 ("The Court's 'Guidelines for Bills of Costs' indicate that *pro hac vice* admission fees are not taxable as costs at all. Consequently . . . the Court determines that none of Defendant's *pro hac vice* admission fees and related expenses are taxable as costs."); *LaBombard*, 2015 WL 9450838, at *2 ("In light of the absence of *pro hac vice* filing fees being specifically listed as a recoverable cost . . . the Court declines to extend the costs recoverable pursuant to Rule 54(d)(1) to include *pro hac vice* filing fees.").

Turning next to the $350.00 associated with service of process on the New York Secretary State, the Court finds that these costs have been adequately substantiated and are otherwise reasonable. Accordingly, the Court respectfully recommends that Plaintiff be awarded reimbursement in that amount. *Fair v. United States*, No. 12-CV-6062, 2014 WL 2862658, at *2 (E.D.N.Y. June 23, 2014) (permitting reimbursement for service of process fees); *Cordero v. Collection Co.*, No. 10 CV 5960, 2012 WL 1118210, at *3 (E.D.N.Y. Apr. 3, 2012) (same); *Seacoast Petroleum Prod., Inc.*, 97 F.Supp.3d at 109 (same).

As to Plaintiff's request for the $15.00 in fees associated with obtaining Certificates of Good Standing, the Court finds that such costs are not compensable. *See Tanzini v. Marine Midland Bank*, 978

F.Supp. 70, 85 (N.D.N.Y. 1997) (disallowing reimbursement of "the $5.00 requested for a certificate of good standing"); *V–Formation, Inc. v. Benetton Grp. SpA*, No. 01 CIV.610 HB, 2003 WL 21403326, at *3 (S.D.N.Y. June 17, 2003) (same); *Document Sec. Sys., Inc.*, 2015 WL 1189551, at *2 (same).

■ With regard to Plaintiff's request for reimbursement of online legal research and long distance telephone charges, *see* Leins Supp. Decl., Ex. 1, these costs are generally considered overhead and are not reimbursable. *See LaBombard*, 2015 WL 9450838, at *1 ("It is well settled that online legal research, general document delivery, and telephone charges are not recoverable costs[.]"); *see, e.g., King v. JCS Enters., Inc.*, 325 F.Supp.2d 162, 171–72 (E.D.N.Y. 2004) (reasoning that "[p]rivate market attorney fee rates reflect overhead costs like electronic research, just as they would reflect the cost of case reporters and other necessary books purchased for a law firm's library"); *Torres v. Gristede's Operating Corp.*, No. 04-CV-3316, 2012 WL 3878144, at *5 (S.D.N.Y. Aug.6, 2012) (declining to award electronic research fees as part of costs and explaining that "[c]omputerized research expenses . . . are recoverable as a portion of attorney's fees rather than as costs"). Indeed, such fees are "routinely disallowed in the Eastern District of New York." *United States v. City of New York*, No. 07-CV-2067, 2013 WL 5542459, at *12 (E.D.N.Y. Aug. 30, 2013) (quoting *Coated Fabrics Co. v. Mirle Corp.*, No. 06-CV-5415, 2008 WL 163598, at *9 (E.D.N.Y. Jan. 16, 2008)).

As to the balance of the costs claimed by Plaintiff (including postage, photocopying and miscellaneous expenses), although the receipts provided are vague and make it difficult for the Court to ascertain whether the amounts being sought have been properly substantiated, the Court is nonetheless recommending that such costs be awarded here.

In light of the above analysis, the Court respectfully recommends to Judge Hurley that Plaintiff be awarded the following costs: (1) filing fee of $400.00; (2) service of process fees in the amount of $350.00; and (3) postage, photocopying and miscellaneous expenses in the sum of $96.03.

## V. Conclusion

For the reasons set forth above, the Court respectfully recommends to Judge Hurley that:

(1) Default judgment be entered against the Defendant D & A;

(2) Plaintiff be awarded $575,545.00 in withdrawal liability;

(3) Plaintiff be awarded $38,732.30 in accrued interest;

(4) Plaintiff be awarded $115,109.00 in liquidated damages;

(5) Plaintiff be awarded the requested injunctive relief;

(6) Plaintiff be awarded $3,806.00 in attorneys' fees; and

(7) Plaintiff be awarded $846.03 in costs incurred.

## VI. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF. A courtesy copy of any objections filed is to be sent to the Chambers of the Honorable Denis R. Hurley, and to the Chambers of the undersigned. Any requests for an extension of time for filing objections must be directed to Judge Hurley prior to the expiration of the four-

teen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**Plaintiff's counsel is directed to serve a copy of this Report and Recommendation upon the Defendants forthwith by overnight mail and first-class mail and to file proof of service on ECF.**

**SO ORDERED.**